UNITED STATES of America, Plaintiff,

v.

William C. BRENNAN, Defendant.

No. 85–CR–452.

United States District Court,
E.D. New York.

Feb. 3, 1986.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. by Ethan Levin-Epstein, Kevin J. O'Brien, for U.S.

Daniel P. Hollman, Matthew L. Byrne, New York City, for defendant.

## REVISED SENTENCING MEMORANDUM

WEINSTEIN, Chief Judge:

After an extensive jury trial the defendant, William C. Brennan, has been found guilty of soliciting and accepting a series of bribes to fix cases in his court over many years. This most serious of crimes attacks the foundation of our judicial system and the faith of citizens in its impartiality.

We have set forth below our explanation of the sentence in some detail for two reasons. First, many communications to the court and testimony of defendant's friends at the trial suggested that the crime is out of character. They emphasized the defendant's otherwise unblemished career as a public official and judge and his fine family and community background. Second, it is important for the public to understand that such a crime by a judge is almost unique in the recent annals of New York courts and that it will not be tolerated.

## I. THE CRIMES

Six separate bribe transactions were charged and proved. Since each telephone call and trip in connection with an interstate crime, as well as each bribe itself, is a separate crime, twenty-six separate felonies were committed. Set out below is a table briefly ' describing the twenty-six crimes, the applicable statutes and the statutory maximum penalties.

### CRIMES AND PENALTIES

| Count | Description of Crime | Statute | Maximum Imprisonment | Maximum Fine | Assessment |
|-------|---------------------|---------|---------------------|--------------|------------|
| 1 | RICO: 2 or more predicate crimes in aid of racketeering | 18 U.S.C. § 1962 | 20 years | $ 25,000 | $ 50 |
| 2 | Conspiracy to commit RICO | 18 U.S.C. § 1962(d) | 20 years | 25,000 | 50 |
| 3 | Interstate travel in aid of racketeering: *Romano* case 11/28/80 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 4 | Interstate telephone call in aid of racketeering: *Romano* case 12/07/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 5 | Interstate telephone call in aid of racketeering: *Romano* case 12/07/80; call from Queens | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 6 | Interstate telephone call in aid of racketeering: *Romano* case 12/07/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 7 | Interstate telephone call in aid of racketeering: *Romano* case 12/09/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |

| Count | Description of Crime | Statute | Maximum Imprisonment | Maximum Fine | Assessment |
|---|---|---|---|---|---|
| 8 | Interstate telephone call in aid of racketeering: *Romano* case 12/09/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | $ 10,000 | $ 50 |
| 9 | Interstate telephone call in aid of racketeering: *Romano* case 12/10/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 10 | Interstate travel in aid of racketeering: *Romano* case 12/10/80; call from Florida | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 11 | Wire fraud: *Romano* case 12/07/80; call from Florida to Queens | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 12 | Wire fraud: *Romano* case 12/07/80; call from Queens to Florida | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 13 | Wire fraud: *Romano* case 12/07/80; call from Florida to Floral Park | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 14 | Wire fraud: *Romano* case 12/09/80; call from Florida to Queens | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 15 | Wire fraud: *Romano* case 12/09/80; call from Florida to Floral Park | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 16 | Wire fraud: *Polisi* case, 12/10/80 | 18 U.S.C. § 1343(a) | 5 years | 1,000 | 50 |
| 17 | Interstate telephone call in aid of racketeering: *Polisi* case, 02/01/85 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 18 | Interstate travel in aid of racketeering: *Polisi* case, 02/02/85 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 19 | Interstate travel in aid of racketeering: *Polisi* case, 02/13/85 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 20 | Interstate travel in aid of racketeering: *Polisi* case, 02/17/85 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |

| Count | Description of Crime | Statute | Maximum Imprisonment | Maximum Fine | Assessment |
|-------|---------------------|---------|---------------------|--------------|------------|
| 21 | Interstate telephone call in aid of racketeering: *Polisi* case, 02/20/85 | 18 U.S.C. § 1952(a) | 5 years | $ 10,000 | $ 50 |
| 22 | Interstate telephone call in aid of racketeering: *Polisi* case, 02/20/85 | 18 U.S.C. § 1952(a) | 5 years | 10,000 | 50 |
| 23 | Wire fraud: *Polisi* case, 02/01/85 | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 24 | Wire fraud: *Polisi* case, 02/20/85 | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 25 | Wire fraud: *Polisi* case, 02/22/85 | 18 U.S.C. § 1343 | 5 years | 1,000 | 50 |
| 26 | Interference with commerce by attempted extortion: *Polisi* case | 18 U.S.C. § 1951(a) | 20 years | 10,000 | 50 |
| | TOTALS | | 175 years | $209,000 | $1,300 |

Since penalties can be cumulative the maximum term of imprisonment to which the defendant is liable is 175 years and the maximum fine is $209,000. It is unusual to cumulate terms of imprisonment. The issue is where, between 0 to 20 years in prison and $0 to $209,000 for a fine, should penalties be fixed.

A mandatory assessment of $50 for each felony count of which the defendant was convicted totals $1300. This cumulative penalty is required by the Comprehensive Crime Control Act of 1984. *See* 18 U.S.C. § 3013. Receipts collected under the assessment statute are used to create a fund to assist crime victims. *See* S.Rep. No. 497, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3607.

While defendant received much more in bribes, the government seeks forfeiture of only $14,000. 18 U.S.C. § 1963. The reason for this reduced demand is discussed below.

### A. FACTS

Investigation of the defendant's activities began early in 1981 when a confidential informant told federal officials that William C. Brennan, a Justice of the Supreme Court, Queens County, State of New York, sitting in Criminal Term, could be bribed. Other informants confirmed these allegations. They were, in brief, that the defendant, who was first elected to the Supreme Court of Queens County in 1970 and re-elected for another fourteen year term in 1984, began to take bribes shortly after his first election. Since Judge Brennan was responsible for presiding over felony cases in the main courthouse of Queens his opportunity to corrupt justice was apparent.

Key government witnesses were Anthony Bruno, a restauranteur, associate of criminals and long-time friend of the defendant; and Nicholas Botta and Salvatore Polisi, two recidivists with substantial connections to the underworld. There were a large number of supporting witnesses. Extensive interlocking telephone calls automatically recorded on telephone company billing records showed Bruno's relationships with the defendant and various criminals in connection with the bribes. Surveillances, court-authorized wiretaps and bugging during the course of the investigation and one wiretap independent of the investigation confirmed much of the details of the testimony. Data in court records demonstrated how the cases were disposed of.

The defendant received and made bribe related telephone calls in the courthouse.

He saw one briber in chambers. Witnesses such as a supervising probation officer and a probation officer in charge of a case contradicted statements of the defendant.

The defense consisted almost entirely of character witnesses who testified that the defendant's background was incompatible with the accusations. The defendant did not take the stand despite the damning testimony against him which was not shaken by defense counsel's vigorous cross-examination. Had he done so, he would have had to either perjure himself or admit that he was strongly influenced in his disposition of cases by his friend, Anthony Bruno, who was acting on behalf of criminals. He might have denied taking cash, but he would have had to admit activities devastating to his career as a judge, requiring his immediate removal from office.

We set out below a brief synopsis of various instances of defendant's corruption between 1972 and 1985.

### 1. JOSEPH PASTORE

In the early 1970s, Joseph Pastore, a childhood friend of Bruno, was arrested for possession of stolen property in Queens County. Pastore's case was pending before the defendant. Pastore was aware of the close friendship between Anthony Bruno, who operated a restaurant near the court, and Judge Brennan. Bruno and Brennan ate at various restaurants together, attended race tracks together and vacationed together.

Pastore asked for Bruno's help, offering to pay for a favorable disposition. Bruno discussed the matter with the defendant who volunteered that something could be done for $10,000.00. Bruno, acting in what became an accustomed role of middleman—or, in the argot of the criminal world, bagman—advised Pastore that Brennan wanted $10,000 to fix the case. Pastore paid the $10,000 in cash. Bruno turned it over to defendant. On November 5, 1973, Pastore was granted a conditional discharge, followed ultimately by dismissal. Pastore expressed satisfaction with the deal.

### 2. NICHOLAS BOTTA AND LARRY MESSINA

Nicholas Botta was a professional gambler with a long criminal record as a book-maker. His partner in bookmaking was Larry Messina. Botta had been an acquaintance of Anthony Bruno since the 1950s.

In the mid-1970s, Botta approached Bruno and asked him to intercede with Brennan because Messina had been arrested for gambling and was awaiting trial before Brennan. He also noted that he had himself been sentenced by Judge Brennan in 1972 to a five-year probation term and that probation was interfering with his criminal activities.

For $15,000 both cases were fixed. Bruno collected this sum in cash and paid it to the defendant.

Messina's case for promoting gambling was dismissed by Judge Brennan in 1974 for failure to prosecute. As for Botta, he met Brennan in his chambers and subsequently Bruno informed Botta that his probation had been terminated. The record makes it clear that the Probation Service opposed this early termination and that nevertheless the judge dictated into the record a misstatement that termination was with the Probation Service's approval.

### 3. DOMINICK CATALDO

Dominick Cataldo, a confirmed criminal, approached Bruno, a long-time acquaintance, in the mid-1970s. He had a criminal case pending before Judge Brennan. While the prosecution's case appeared to be weak, he wanted insurance. For $3,000, identification evidence was suppressed and the indictment was dismissed.

### 4. JACKIE DONNELLY

Jackie Donnelly was a member of the criminal class and a close associate of Dominick Cataldo. He had been informed of the services available from Brennan through Bruno. Donnelly was arrested in Queens for possession of a weapon. His case was pending before Judge Brennan.

A price of $15,000 was agreed upon: $10,000 for the judge and $5,000 for the broker. The case was reduced to a misdemeanor and Donnelly was sentenced by Brennan to a $250 fine and time served.

## 5. JOHN ROMANO

Dominick Cataldo, a "made member" of an organized crime gang, had continued use for Bruno's and Brennan's help in cases involving friends and associates. In February 1980 he told Bruno that a friend, Anthony "Footsie" Romano, needed Brennan's assistance in a case involving Anthony's son, John. John had been indicted for attempted murder and he was awaiting trial before Judge Brennan. Cataldo insisted on a dismissal since John was already on probation and could not afford another conviction of any kind.

Brennan set a price of $15,000. To Bruno's surprise, Cataldo turned down the deal, informing Bruno that other arrangements had been made. In fact there was apparently some sort of a scam, since Brennan informed Bruno that no arrangements for payments to him had been made. He assured Bruno that he used no other intermediary.

Brennan tried the Romano case without a jury. According to Bruno, Brennan and he discussed the issue of whether John should be found guilty. Bruno suggested that it would be a "good lesson" to convict John since apparently John's attorney was keeping the payoff money instead of passing it on to the judge. Brennan convicted John Romano of assault and possession of a weapon in July of 1980.

In November of 1980, Botta approached Bruno about the Romano case. By that time Bruno had sold his Queens restaurant and moved to Fort Lauderdale, Florida, where he had opened another restaurant, the "Runway 84." "Footsie," the father of John, had importuned Larry Messina to request Botta to ask Bruno to intervene with Brennan.

Bruno spoke to the judge who indicated that something could be done because of a "loophole" in the case. He demanded and received $15,000.

As part of the scheme a perjurious affidavit from one Geno Parisi, then ensconced in a penitentiary, was produced. On the basis of that "newly discovered evidence" a new trial was granted by Judge Brennan in 1981. This time a jury was requested. In a trial before another judge the defendant was found not guilty.

## 6. SALVATORE POLISI

In May of 1984 Salvatore Polisi, a career criminal, was arrested in Queens and charged in the state court with the sale of cocaine. Since he had previously been convicted of forgery, gambling, and robbery and was a known associate of the organized crime fraternity, Polisi faced a long prison term. He decided it would be in his interest to approach the Federal Bureau of Investigation and seek employment as an informant.

Polisi was aware that Justice Brennan had a reputation in the criminal community for taking bribes. He stated that he, himself, had at one time paid $75,000 to an attorney (who agreed to give it to the defendant) for his wife's and brother-in-law's cases to be disposed of with a small fine and for his own to be handled favorably. The attorney had told Polisi that he had delivered the money to the defendant, but the defendant told Bruno that this was untrue.

A deal was struck between the F.B.I. and Polisi to seek evidence against Bruno and Brennan. In January of 1985, acting under the tutelage of the F.B.I., Polisi met with Joseph Cataldo, the brother of Dominick Cataldo, a satisfied customer. He asked for help in approaching Anthony Bruno since he was aware that Dominick Cataldo had had cases fixed for himself and close associates. Joseph Cataldo agreed to contact Bruno in Florida. During the introductory call to Bruno vouching for Polisi background voices from other criminal figures gave Bruno the necessary assurance that he was in fact being approached by bona fide members of the underworld.

Polisi proceeded to Bruno's restaurant in Fort Lauderdale where Bruno told him that he would have to check with Judge Brennan. Their meeting was fortuitous since Brennan was about to arrive in Florida for a winter vacation.

This first meeting between Bruno and Polisi took place on January 31. The next day, February 1, 1985, Bruno called Brennan in Queens. Brennan pointed out that the case was pending before another judge and, therefore, the fix would cost Polisi a great deal of money. Brennan agreed to look into the matter. Court records show that almost at once Polisi's file was delivered to Brennan's chambers.

On February 2 Brennan arrived in Florida and told Bruno he had reviewed the Polisi court file. He gave Bruno key information from the file. Since he and his friend, the judge, were spending the day at the Gulfstream Racetrack, Bruno wrote the information on a betting slip. The slip was later retrieved and constituted an important piece of evidence since it contained information that could not have come to Bruno except from someone cognizant of the details of criminal proceedings in Queens.

Pursuant to Brennan's instructions, Bruno informed Polisi that a $25,000 down payment was required. Further negotiations between Bruno and Polisi and Bruno and Brennan took place in Florida and by telephone between New York and Florida.

Polisi pressed for confirmation from Brennan, raising Brennan's suspicions. The judge told Bruno that he was "too old to go to jail." Nevertheless, his suspicions were assuaged and arrangements for the bribe went forward.

Brennan returned to New York. Bruno received the $25,000 down payment in Florida.

Alerted to the fact that the F.B.I. was conducting a surveillance near his restaurant, Bruno became nervous. On February 21, the defendant detected signs of surveillance in New York. He called Bruno and told him not to fly to New York with the money, but to await further instructions.

By March 4 it was fairly clear to Brennan that he was being followed by the F.B.I. Brennan called Bruno and ordered, "Tell your friend that the apartment is not available. Tell him to go elsewhere. Give him back the deposit." Bruno then gave Polisi back the $25,000. On March 7 Bruno was arrested in Florida.

On March 11, the defendant was interviewed in Queens. He admitted that Bruno was his friend, but denied ever having heard of Salvatore Polisi. He also denied ever speaking with Bruno about any case pending in the Queens courthouse. On July 26 Judge Brennan was indicted.

## B. STATUTES

The crimes charged were racketeering, bribe receiving, interstate travel in aid of racketeering, fraud by interstate telephone, attempted extortion and conspiracy to engage in a racketeering enterprise. The defendant was indicted as a principal and conspirator as well as an aider and abettor.

The first two counts of the indictment alleged violations of the Racketeer Influenced and Corrupt Organizations statute, known as the RICO statute. Count One charged the defendant William C. Brennan with conducting or participating in the conduct of the Supreme Court of the State of New York, Queens County, through a pattern of racketeering activity consisting of four racketeering acts. Count Two charged the defendant with conspiring with other persons to violate the RICO statute.

Under Count One, one of the elements that the government proved was that the defendant committed at least two of the four racketeering acts charged. Under Count Two, one of the elements that the Government proved is that the defendant conspired to commit two or more charged predicate acts. The four predicate acts alleged in the indictment correspond to four criminal cases that the indictment charged were corrupted by the defendant through his acceptance of, or agreement to accept, bribes. The defendant was charged with bribe receiving in connection with the *Messina* case (the first predicate act), the *Botta* case (the second predicate act), the *Romano* case (the third predicate act), and the *Polisi* case (the fourth predicate act).

The government proved that in connection with the *Romano* and the *Polisi* cases,

the defendant committed 24 separate crimes which are some of the predicate acts. Each was an independent count in the indictment. These counts fall into three categories: interstate travel in aid of racketeering, wire fraud, and extortion.

The defendant was charged with various counts of Interstate Travel in Aid of Racketeering in violation of Title 18, United States Code, Section 1952(a), also known as the Travel Act. In Counts Three through Ten, the defendant was charged with violating the Travel Act in connection with corruption through bribery in the *Romano* case. In Counts Seventeen through Twenty-Two, the defendant was charged with Travel Act violations in connection with corruption through bribery in the *Polisi* case. Each Travel Act count is based upon an act of interstate travel or an interstate telephone call involving one of these two cases.

Section 1952(a) of the Travel Act provides in part:

> Whoever travels in interstate ... commerce or uses any facility in interstate commerce ... with intent to ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of any unlawful activity, and thereafter performs or attempts to perform [certain] acts ...

shall be guilty of an offense against the United States. The statute goes on to define "unlawful activity" to include "bribery ... in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b).

■ The law recognizes that a person who knowingly and wilfully aids, abets, induces or causes another person to commit an offense is just as guilty of that offense as if he committed it himself. 18 U.S.C. § 2. Federal law also provides that a person who acts as a coconspirator with another person in furtherance of a common criminal purpose is, while he is a member of the conspiracy, criminally liable for all of the acts by his coconspirators that further the conspiracy, even if the acts were committed in his absence and without his knowledge.

These principles apply to every offense that is alleged in the indictment.

■ The first element of a Travel Act violation that the government established is interstate travel or use of the telephone for an interstate call—in this case, from New York to Florida or vice versa. It was not necessary for the government to have proved that the defendant himself travelled or participated in the telephone call. Nor was it necessary to show that the defendant specifically authorized another person to do one of these acts or that the defendant was even aware that the act was taking place. The evidence demonstrated that each call or act of travel was conducted by a person acting as a coconspirator or aider or abettor of the defendant in furtherance of the continuing conspiracy between Bruno and Brennan from early 1970 to 1985.

The second element that the government proved was that the interstate travel or telephone call in question was conducted with the specific intent to further the unlawful activity of bribery. It proved enough when it demonstrated that one purpose of the travel or call was to further Bribe Receiving. The defendant, it was shown, deliberately associated himself with the illegal activity with the purpose of making it succeed.

The defendant was also charged with multiple counts of Wire Fraud in violation of Title 18, United States Code, Section 1343. In Counts Eleven through Sixteen the defendant was charged in connection with the *Romano* case. And in Counts Twenty-Three through Twenty-Five, the defendant was charged in connection with the *Polisi* case. Each Wire Fraud count in the indictment is based upon a telephone call between New York and Florida involving one of these two cases.

Title 18, United States Code, Section 1343 provides in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, ... transmits or causes to be transmitted by means of wire ... communication in interstate ... commerce, any ... signals

... or sounds for the purpose of executing such scheme or artifice,

shall be guilty of an offense against the United States. In order to establish the offense of Wire Fraud, the government proved three essential elements: first, that a scheme to defraud was devised; second, that the defendant knowingly and wilfully participated and third, that in execution or in furtherance of that scheme, the use of the interstate wires occurred.

The evidence showed that the defendant Brennan with other persons devised a scheme to defraud the people of Queens County and the State of New York, whom he served, of their right to his faithful services. An intangible or abstract right, such as the right to honest and faithful services, can be the subject of fraud.

■ The gist of the offense is the use of the interstate telephone for the purpose of executing a scheme to defraud, whether or not the scheme actually succeeded. The government also proved that the defendant knowingly and wilfully participated with knowledge of the fraud. The indictment relies upon the same interstate telephone calls between New York and Florida charged in connection with the Travel Act. It was not necessary that the use of the telephone be central or essential to the scheme.

The defendant was also charged with one count of Interference with Commerce by Attempted Extortion, in violation of Title 18, United States Code, Section 1951(a). Count Twenty-Six of the indictment charges that the defendant attempted to affect commerce by attempted extortion in connection with the *Polisi* case, by attempting to obtain approximately $25,000 under color of official right. Section 1951(a) provides in part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by ... extortion or attempts ... so to do,

shall be guilty of an offense against the United States.

In order to prove the defendant guilty of a violation of this section as alleged in the indictment, the government proved three elements beyond a reasonable doubt: first, that the defendant or those he was conspiring with or aiding and abetting knowingly and wilfully attempted to induce Polisi to part with money; second, that the defendant attempted to do so by means of "extortion"; and third, that the attempt had an actual or potential effect upon interstate commerce.

■ The government proved that the crime of extortion would have been completed but for the fact that Polisi was in reality a government informant who had received the $25,000 from the F.B.I. The acts of a person who intends to commit a crime constitute an attempt when the acts themselves indicate an intent to commit the crime, and the acts are a substantial step in a course of conduct planned to culminate in the commission of the crime.

The second element that the government proved was that the defendant or someone he was conspiring with attempted to induce Polisi to part with money by means of extortion. Section 1951(a) of Title 18 defines "extortion" as:

> The obtaining of property from another [person], with his consent, induced by wrongful use of actual or theatened force, violence, or fear, *or under color of official right.*

(Emphasis supplied.) Thus, extortion means the obtaining of the property of another person with his consent induced either by wrongful use of fear *or* under color of official right.

■ What the government proved was that the defendant attempted to induce Polisi to part with money through the wrongful use of the defendant's position as a judge. The defendant represented himself to Polisi, through Bruno, as capable of doing something for Polisi because defendant was a judge. He was guilty whether or not he could actually perform the services Polisi sought.

The third and final element that the government proved was that the defendant's attempted extortion had an actual or potential effect on interstate commerce, however small. Polisi represented to Bruno that he, Polisi, would have to sell property located in New York or Florida in order to raise the bribe money. Since Bruno believed this to be the case, and there was an objective basis for that belief, there was a potential impact on interstate commerce as required by section 1951(a).

As part of the RICO counts the defendant was charged with Bribe Receiving in violation of Section 200.10 of the New York Penal Law in connection with the *Botta* case, the *Messina* case, the *Romano* case and the *Polisi* case. Section 200.10 of the New York Penal Law provides:

> A public servant is guilty of bribe receiving in the second degree when he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that his ... opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced.

In order to prove the defendant guilty of Bribe Receiving, the government proved three elements: first, that the defendant was a public servant; second, that he knowingly and intentionally solicited or agreed to accept money from another person; and third, that the defendant solicited or agreed to accept the money upon an understanding with the bribe-giver that the defendant's opinion, judgment, action, decision or exercise of discretion as a public servant would be influenced.

■ New York Penal Law defines a public servant as any public officer or employee of the State of New York or a political subdivision or governmental instrumentality within the State of New York. The defendant, as an elected Justice of the Supreme Court of the State of New York, was a public servant for purposes of the Bribe Receiving statute.

The second element proved was that the defendant solicited, accepted or agreed to accept money from another person. Any of these three acts satisfied this element of Bribe Receiving. It was, therefore, not necessary for the government to prove that the defendant actually accepted money. In fact it was clear that Bruno accepted money as agent of the defendant.

■ The third element of Bribe Receiving is that the defendant had an understanding, directly or through another, with a bribe-giver that his opinion, judgment, action, decision or exercise of discretion as a public servant would be influenced. The essence of the crime of Bribe Receiving is this understanding or agreement. It is immaterial that the defendant may in fact have failed to keep his part of the understanding with the bribe-giver. The defendant was properly convicted of Bribe Receiving even though the result sought by the bribe-giver was in fact lawful and proper, and, as suggested by defendant's counsel, the same thing would have happened in the absence of any bribe.

Count One charged the defendant, as pointed out above, with conducting the affairs of the Queens Supreme Court through a pattern of racketeering activity between June 1973 and July 1985 in violation of Title 18, United States Code, Section 1962(c). Section 1962(c) provides in part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

■ Under the statute "racketeering activity" means any act involving any of the crimes charged in the indictment; and "pattern of racketeering activity" requires at least two acts of racketeering activity, the last of which occurred within ten years of a prior act of racketeering.

In order to prove the defendant guilty of the crime charged in Count One, the substantive RICO count, the government proved beyond a reasonable doubt the following five elements: first, that the Su-

preme Court of the State of New York was an enterprise for purposes of the RICO statute; second, that the activities of this enterprise affected interstate commerce; third, that the defendant was employed by or associated with this enterprise; fourth, that the defendant conducted or participated, directly or indirectly, in the affairs of this enterprise; and fifth, that the defendant knowingly and wilfully conducted or participated in the Court's affairs through a pattern of racketeering activity—that is at least two predicate acts occurring within ten years of each other.

The Supreme Court in Queens was an enterprise as defined by the RICO statute during the period stated in the indictment. An enterprise need not be criminal in nature. All that is required is an organization.

The activities of this enterprise affected interstate commerce. It purchased some of its supplies from out-of-state vendors.

That the defendant was employed as a judge by or associated with the Queens Supreme Court was never in doubt. He certainly participated in the conduct of the affairs of the Court.

To establish a pattern of racketeering activity the government proved beyond a reasonable doubt that the defendant committed at least one of the offenses charged under at least two of the predicate acts alleged.

Count Two charges a conspiracy to violate the RICO statute by participating in the affairs of Supreme Court through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d). That section reads in part as follows:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section.

There was more than ample evidence to show a continuing conspiracy from the early 1970s to 1985 to accept bribes as charged. Under the circumstances, a conspiracy to violate RICO was proved.

No substantial objection was taken to the legal theories embodied in the charge and described in this section. Generally the charge was favorable to the defendant. It became the law of the case.

Although the defendant moved, pursuant to Rule 29 of the Rules of Criminal Procedure, to have the verdict set aside on the ground that there was insufficient evidence to support any of the counts of the indictment, it is obvious that there was no merit to this contention. To be convinced of this one need merely examine some of the charts used by the government in final arguments describing the *Polisi* case. Much of the information on the charts is based on interlocking telephone records, and wiretap and sound recordings whose authenticity could not be challenged.

**296**

## PEOPLE OF THE STATE OF NEW YORK
## v. SALVATORE POLISI (IND. NO. 8738/84)

| | 1984 |
|---|---|
| | Salvatore Polisi indicted for possession and sale of cocaine. |

| | 1985 |
|---|---|
| | Polisi meets with Joseph Cataldo and makes arrangements for Joseph Cataldo to introduce Polisi to Anthony Bruno by telephone. |
| | "Sammy" telephones Anthony Bruno in Florida and, from the background, Joseph Cataldo is heard instructing "Sammy" to ask him to meet with Salvatore Polisi. |
| | Polisi meets with Bruno and asks him if he can arrange to have Polisi's case fixed. Bruno says he will ask JUSTICE WILLIAM C. BRENNAN and get back to him. |
| | Bruno telephones BRENNAN (at 11:58 a.m.). BRENNAN calls him back, and Bruno tells him about Polisi and Polisi's case. |
| | *Polisi* court file is requisitioned from Queens Supreme Court file room to "J. Brennan's Chamb." |
| | Bruno tells Polisi that he has spoken with the defendant. |
| | BRENNAN travels from Queens, New York to Florida. |
| | Polisi meets with Bruno and Bruno tells him the facts of his arrest as explained to him by BRENNAN. |
| | Bruno and BRENNAN meet at Gulfstream Racetrack. BRENNAN explains facts and circumstances of *Polisi* case to Bruno who makes notes on betting slip. |
| | Bruno briefs Polisi on conversation with BRENNAN using betting slip as reference and they agree that $25,000 will be paid in advance. |
| | Polisi tells Bruno that he must return to New York. Bruno instructs him to return to Florida for the payoff. |

## PEOPLE OF THE STATE OF NEW YORK
### v. SALVATORE POLISI (IND. NO. 3738/84)

#### 1985 (cont'd)

| Date | Event |
|---|---|
| Feb. 9, Sat. | Bruno telephones Polisi in New York to tell him that BRENNAN will be in Florida through the following Wednesday or Thursday. Polisi says that he will not be back to Florida before Friday. Bruno tells him that he will get BRENNAN to stay longer. |
| Feb. 10, Sun. | BRENNAN telephones Bruno at home (at 11:36 a.m.) to confirm dinner arrangements at Christine Lee's the following night. Bruno tells BRENNAN that he has to talk with him about something and remarks that "it will work out then" when BRENNAN tells him that he plans to still be in Florida on Friday, 2/15/85. |
| Feb. 11, Mon. | Bruno and BRENNAN meet at Christine Lee's and discuss Polisi case. |
| Feb. 13, Wed. | Polisi returns to Florida from New York and meets with Bruno at Runway 84. Arrangements made for money to be paid to Bruno at racetrack after Polisi sees Bruno with BRENNAN. |
| Feb. 15, Fri. | Bruno meets BRENNAN at Diplomat Hotel and explains arrangements for payoff. BRENNAN extremely suspicious that Polisi is an informant and tells Bruno to call it off. |
| Feb. 15, Fri. | Bruno telephones Polisi and arranges for meeting that night to discuss a problem created by Polisi. |
| Feb. 15, Fri. | Bruno searches Polisi for concealed tape recorder and, finding none, arranges for money to be paid to him on 2/16 after which he will give it to BRENNAN to take back to New York. |
| Feb. 16, Sat. | Bruno meets BRENNAN at Gulfstream Racetrack. BRENNAN tells Bruno "...no, no, no we're not going to do it that way." Instead, he instructs Bruno to hold money and bring it to New York himself when summoned. |
| Feb. 16, Sat. | Bruno telephones Polisi and instructs him to bring money to restaurant that night because BRENNAN is leaving the next day. |

PEOPLE OF THE STATE OF NEW YORK
v. SALVATORE POLISI (IND. NO. 3738/84)

1985 (cont'd)

| | |
|---|---|
| Feb. 16, Sat. | Polisi pays $ 25,000 to Bruno. |
| Feb. 17, Sun. | BRENNAN travels to New York from Florida. |
| Feb. 19, Tues. | Bruno is told by son of F.B.I. surveillance of Runway 84. |
| Feb. 20, Wed. | BRENNAN telephones Bruno from Chambers (at 3:54 p.m.) and instructs him to come to New York. Bruno is reluctant and BRENNAN says he will get back to him on 2/22/85. |
| Feb. 21, Thur. | BRENNAN detects surveillance. |
| Feb. 22, Fri. | BRENNAN telephones Bruno from Justice Smith's Chambers (at 3:58 p.m.) and tells him to "hold off ... don't come yet ... something has come up." |
| Feb. 25, Mon. | Bruno reassures Polisi. |
| Feb. 26, Mon. | BRENNAN telephones Bruno, says "tell your friend the apartment's not available. Give back the deposit." |
| Feb. 28, Mon. | Bruno pages Polisi at Holiday Inn to tell him that BRENNAN has called and said that nothing can be done. |
| Mar. 2, Mon. | Bruno returns $24,500 to Polisi, telling him that he feels terrible about not being able to do anything for him. |
| Mar. 8, Fri. | Anthony J. Bruno arrested and search warrants executed. Betting slip is found in Bruno's wastebasket. |
| Mar. 8, Fri. | Bruno attempts to reach Melvin Lebetkin in hope that he will notify BRENNAN of Bruno's arrest. |
| Mar. 11, Mon. | JUSTICE WILLIAM C. BRENNAN interviewed by F.B.I. He denies any knowledge of Salvatore Polisi or of ever discussing any cases in Florida. |

## II. RESTITUTION

On December 12, 1985, following the jury verdict, the defendant waived a jury determination of the amount of forfeiture under the RICO statute in favor of this court's determination of that issue. The government requested that the court order the defendant at the time of sentencing to forfeit bribery proceeds in the amount of $14,000 to the United States. 18 U.S.C. § 1963. Section 1963(a) of Title 18 of the United States Code provides that a person convicted under the RICO statute shall forfeit to the United States "any interest he has acquired ... in violation of "the RICO statute." The Supreme Court has interpreted this language to include the proceeds and profits derived from racketeering. *See Russello v. United States*, 464 U.S. 16, 21–22, 104 S.Ct. 296, 299–300, 78 L.Ed.2d 17 (1984). The evidence showed beyond any reasonable doubt that the defendant personally acquired much more than $14,000 in criminal profits from the specific predicate acts alleged in the indictment as part of the racketeering activity.

In determining the amount subject to forfeiture the government proceeded on four conservative assumptions. First, it excluded bribes that the defendant received

for corrupting cases not named as predicates in the indictment. Thus, while the evidence at trial demonstrated that the defendant received $23,000 for corrupting the *Pastore, Cataldo,* and *Donnelly* cases it did not seek forfeiture of these criminal proceeds. Second, it excluded those portions of the bribes that the defendant gave to his intermediary, Anthony Bruno, even though such payments clearly furthered the defendant's corrupt scheme. The money given to Bruno consists of $5,000 in each of the *Messina* and *Romano* cases. Third, where the trial testimony was unclear as to the precise amount of the bribe, the government adopted the lower figure. Finally, the government omitted the *Polisi* case from its calculations since the defendant returned the $25,000—less a $500 "tip" to Bruno—in that case to Polisi, albeit in an attempt to avoid detection.

The bribes thus calculated are as follows: $2,000 in the *Botta* case, $7,000 in the *Messina* case and $5,000 in the *Romano* case for a total of $14,000. None of these figures can be seriously disputed in light of the jury's verdict. Defendant does not contest the computation. The court orders the defendant to forfeit $14,000 to the United States.

## III. SERIOUSNESS OF THE CRIME

From biblical times on the crime of bribery has been viewed as serious. The Old Testament specifically warns against judges taking bribes and forbids it. In the King James Version it is written: a judge shall not "respect persons, neither take a gift; for a gift doth blind the eyes of the wise, and pervert the words of the righteous." Deuteronomy XVI, 19. Rashi, the great medieval Jewish commentator, notes respecting this passage "BRIBERY DOTH BLIND—As soon as he (the judge) has accepted a bribe from him (one of the parties) it is impossible for him not to incline his heart to him trying to find something in his favor." Rashi's Commentaries, 87 (M. Rosenbaum et al.) (5733 [1973]).

In Anglo-American jurisprudence the most notorious judicial bribe-taker was Sir Francis Bacon. In a few years as Chancellor of the Exchequer, he reportedly took hundreds of thousands of pounds in bribes. After pleading guilty he was fined forty thousand pounds, banished from the court, disqualified from holding public office and sentenced to incarceration in the Tower of London. Because of his close relationship with James I he was almost immediately released from imprisonment and suffered no serious penalty except that his career as a public servant was ended. He spent the rest of his life writing and as a result is generally remembered as a philosopher, essayist and statesman, rather than as a corrupt judge. *See, e.g.,* Columbia Encyclopedia 204 (1975); J.T. Noonan, Jr., Bribes, 334 ff. (1984); J.J. Epstein, Francis Bacon: A Political Biography, 133 ff. (1977); C.D. Bowen, Francis Bacon, 175 ff. (1963); *but see* A. Dodd, The Martyrdom of Francis Bacon (undated).

Other judges of the time were apparently not so fortunate in their acquaintanceship. In discussing the pending case of Sir Francis Bacon, Lord Coke indicated that a number of judges had been hanged for the same offense. J.T. Noonan, Jr., Bribes, 354 (1984).

The most notorious judge of our times was Martin T. Manton. Manton sat as Chief Judge of the Court of Appeals for the Second Circuit and even sought appointment to the United States Supreme Court. He solicited bribes over many years in the Foley Square courthouse. Ripples of his corruption spread to other judges and eminent lawyers here and elsewhere. On the ground that the statute of limitations and the then criminal provisions prevented more than a conspiracy indictment, he was indicted for that crime, tried, found guilty, and sentenced to the maximum term of two years in prison. *See generally* J. Borkin, The Corrupt Judge, 23 ff. (1962) (also listing other federal judges subjected to inquiry about corruption at 219 ff.); A.V. Gershensen, The Bench is Warped, 41 ff. (1963); C.R. Ashman, The Finest Judges Money Can Buy, 42 ff. (1973).

Other judges of recent times who have been found guilty of felonies are listed in the table below. The penalties have varied, but in recent times, as indicated by the Chicago experience, they have become more harsh. This is due in part to the increased penalties and the increased reach of statutes such as RICO. It is apparent that at least in this country the law enforcement system and the public are becoming less tolerant of this crime and more inclined to punish it severely.

JUDGES FOUND GUILTY OF CRIMES IN RECENT YEARS

| District | Judge's Name | Judicial Position | Offense | Sentence |
|---|---|---|---|---|
| S.D.N.Y. | James V. Keogh | Supreme Court, NY | 18 U.S.C. 1503 Obstruction of Justice (attempted bribery to intervene with federal judge in sentencing) | 8/2/62—2 years |
| E.D.N.Y. | Joseph P. Pfingst | Supreme Court, NY | 18 U.S.C. 152 Bankruptcy Fraud (prior to taking · office) | 7/14/72—3 years; Sec. 3651, to serve 4 months and 32 months probation. |
| D.N.J. | James J. DelMauro | Municipal Court (Misdemeanor jurisdiction) | 26 U.S.C. 7206 Income Tax Violation | 7/26/74—2 years pursuant to 3651, to serve 4 months, probation 3 years, $5,000 fine and costs of prosecution. |
| E.D.Mich. | John B. Swainson | State Supreme Court (Highest Appellate Court) | 18 U.S.C. 1621 Perjury | 1/26/76—1 year and 1 day—suspended sentence—to serve 60 days, 10 months unsupervised probation. |
| D.Nev. | Robert Mullen | Municipal Court (Misdemeanor jurisdiction) | 26 U.S.C. 7206(1) Income Tax Violation | 2/13/78—ISS, 3 years probation. |
| N.D.Tex. | Phil Fugitt | County Court (Misdemeanor jurisdiction) | 18 U.S.C. 242 Deprivation of Rights under Color of Law | 6/27/83—1 year—reduced 11/27/83—5 months and 7 months probation. |
| E.D.Mich. | Evan Callanan, Sr. | District Court (Misdemeanor jurisdiction) | 18 U.S.C. 1961 2 Counts RICO Violation (taking payoffs to fix cases) | 10/14/83—10 years each count concurrent. |

| District | Judge's Name | Judicial Position | Offense | Sentence |
|---|---|---|---|---|
| N.D.Ill. | John M. Murphy | Circuit Court (Traffic and Misdemeanor jurisdiction) | 18 U.S.C. 1341 Mail Fraud 18 U.S.C. 1951 Commerce Violation 18 U.S.C. 1962(d) RICO Violation | 8/8/84—10 years |
| N.D.Ill. | John J. Devine | Circuit Court (Traffic and Misdemeanor jurisdiction) | 18 U.S.C. 1341 18 U.S.C. 1962(d) Mail Fraud and RICO Violation | 12/18/84—15 years |
| D.Nev. | Harry Claybourne | U.S. District Court | 26 U.S.C. 7206 Income Tax Violation | 10/3/84—2 years and $10,000 fine— stay pending appeal |
| N.D.Ill. | Richard LeFevour | Circuit Court (Chief Judge) (Traffic and Misdemeanor jurisdiction) | 18 U.S.C. RICO 18 U.S.C. 1341 Mail Fraud 26 U.S.C. 7206 Tax Return Violation | 8/27/85—12 years |
| N.D.Ill. | Otto Kerner | Court of Appeals 7th Circuit | Conspiracy, Bribery, Fraud, Tax Evasion (prior to taking office) | 4/19/73—3 years and $50,000 fine |

The cases closest to the defendant's are those from the Northern District of Illinois from 1983 to 1985; state judges convicted of bribe-related offenses received between 10 to 15 years imprisonment. Many of the other cases such as that of Kerner and Pfingst involved crimes committed before they became judges.

Fortunately, bribery of judges in this state is the rarest of exceptions. All agree that it is intolerable to condone bribes of judges in a democracy such as ours. The most comprehensive treatise on the subject summarizes the reasons as including the following:

1. *Bribery is universally shameful.* Not a country in the world which does not treat bribery as criminal on its lawbooks....

2. *Bribery is a sellout to the rich.* In any situation ruled only by money or its equivalent, the deeper pocket will prevail.... If bribes were not morally objectionable, we would live in a world of pure plutocracy where wealth would be the measure of all things....

In judicial proceedings, efforts not totally useless are made to make factors other than money determine the outcome: the skill of the lawyers and the prudence of the judge as well as more general ideals such as fairness and truth are given a weight that would be reduced to zero if bribery were acceptable and money alone counted....

3. *Bribery is a betrayal of trust.* Trust, that is, the expectation that one will do what one is relied on to do, is a precious necessity of every social enterprise. The notion of fidelity in office, as old as Cicero, is inextricably bound to the concept of public interest distinct from private advantage. It is beyond debate that officials of the government are relied upon to act for the public interest not their own enrichment. When they take bribes they divide their loyalty. Whether or not they consciously act against the public interest, they have

302

adopted a second criterion of action, the proper reciprocation of the bribe. Their resultant conflict of interest is always a dilution of loyalty, always a betrayal of trust....

J.T. Noonan, Jr., Bribes, 702–705 (1984).

## IV. CONSIDERATIONS IN ASSESSING PENALTIES

No crime is more corrosive of our institutions. In the final analysis the judicial system depends upon the trust of the people and the impartiality of the judges. In recent years the growth of crime and the failure of the state to provide adequate resources to the criminal justice system has placed the courts under increasing tension and pressure. Were the public to lose faith in the honesty of the judges, much of the law's barrier to vigilanteism and chaos would crumble. When we consider the various theories for imposing sentence, we cannot ignore public perceptions of morality and justice.

Specific deterrence of this judge is not needed. The defendant will never serve as a lawyer or as a judge or hold any office of public trust. Incapacitation through incarceration is not required for much the same reason.

General deterrence is not a major factor. Most judges act properly out of a sense of duty, not to avoid sanctions.

Punishment as a just desert for an evil deed is justified. There has been, however, a great deal of severe punishment already. A judge at the pinnacle of his career, secure in the admiration of the community and the perquisites of high office, has been removed and consigned to the abyss of public degradation. He has lost his office and he will be automatically disbarred.

■ A court's "concern for the 'public message' should not be an overriding concern" in sentencing. *United States v. Tolla*, 781 F.2d 29, 34 (2d Cir.1986). It is important, nevertheless, for the public to realize that white collar criminals will not be dealt with less harshly than are those criminals who have neither the wit nor the position to commit crimes other than those of violence.

Having received the great boon of high office, public officials must be prepared to pay the high cost of their own acts of betrayal. The net result may well be that a judge convicted of a crime will be treated more harshly than one who commits an equivalent offense in a corporate or other private entity. That is a hazard of the position.

Bribe receiving is essentially a crime of greed for money. An appropriate way to fit the punishment to the crime is to fine the receiver heavily.

### A. MITIGATING CIRCUMSTANCES

There are a number of circumstances that militate against a maximum sentence. They are set out below.

*Improbability.* There is always a possibility in any criminal conviction that the jury has made a mistake in its findings of fact and that an innocent person has been convicted. The courts deal with probabilities, never certainty. It is for this reason among others that many jurists who appreciate the possibility of error oppose capital punishment. As a token of humility about the law's limited fact-finding capacity almost never should the court impose the maximum penalty of imprisonment permitted by statute. It is remotely possible that the defendant is innocent. Based on the evidence produced at the trial, the probability of innocence is so low that this factor is not an important one. The jury verdict must be assumed to be correct.

■ *Lack of Perjury.* The defendant has not perjured himself although he did attempt to mislead the F.B.I. during its investigation. In this district failure of a defendant to lie on the witness stand is considered an appropriate ameliorative factor in imposing sentence. *Cf. United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). No credit, however, can be given for the defendant's having admitted his guilt. This action would have saved the government and the

people considerable money and effort and suggested a degree of contrition not reflected in the defendant's attitude. *Cf. United States v. Araujo*, 539 F.2d 287, 291–92 (2d Cir.1976). No reduction for this factor can be given.

*Positive Family Life and Work Record.* The defendant was born in 1918 in Manhattan of hard working industrious parents. His father drove a vehicle for the Police Department as a civilian. His mother kept a home for the family of three children.

The defendant attended parochial grammar school and public junior high and high school. He received above average grades. He was a member of the cross-country track team, but he refused a partial scholarship to Michigan State University because his parents needed financial assistance. He worked as a produce clerk and bellhop, insurance clerk and clerk for the Army Ordnance Department.

In 1942, defendant enlisted in the United States Air Force. He was discharged in 1944 as a result of a non-combat injury.

After the war, while employed full time by various law enforcement agencies, he attended New York University and received a Bachelor of Arts degree in 1946. In 1948 he received a Law degree from New York University.

When he was 22 he married his present wife. They have a harmonious relationship. Their daughter has three children. Their son is also married with two children; he attends school while he works. Defendant's family of wife, two children and five grandchildren is close knit and represents a strong indication of the defendant's positive achievements in his intimate personal relationships. That success is confirmed by the many letters from members of the community and members of the bench, bar and various governmental agencies.

The young couple purchased a modest one-family attached home in Elmhurst in 1955 for $16,000; its present estimated value is $200,000. Defendant has lived on a relatively modest scale. His and his wife's present assets together amount to some-

where in the order of three-quarters of a million dollars. He is receiving a pension from the Veterans Administration based upon his military service and an additional pension as a result of his service to the state.

His neighbors describe the defendant as polite, respectful and civic-minded. Support of the community was reflected in the past by defendant's success as an attorney, by his appointment as a Civil Court judge, by his election as Assemblyman and Senator, and, ultimately, by his election and reelection as a Supreme Court justice. In all those capacities he was industrious and well respected and made substantial contributions to the welfare of the community.

*Health.* The defendant's present health is characterized by his treating physician as poor. Among his ailments are high blood pressure, diabetes mellitus, peripheral vascular disease and a variety of other conditions. Given his present age of 67, the prognosis is described as fair.

*Attitude as a Judge.* It must be counted in defendant's favor that as a judge he was not harsh. As one communication to the court put it:

> His sentencing, whether after a plea or trial verdict, is usually compassionate and not vindictive. Repeaters and those who are vicious and cruel have *not* been given less than they deserved.

(Emphasis in original.)

### B. AGGRAVATING CIRCUMSTANCES

*Nature of Crime.* The nature of the crime has already been dealt with. It is a compounding factor that this was neither a crime of passion nor a momentary lapse.

*Repetition Over Many Years.* Bribes were taken repeatedly over many years in an unreflective way suggesting a lack of appreciation of the degree to which his behavior deviated from acceptable practice. The fact that Brennan was so casually corrupt and amiably dishonest is in some respects even more offensive than Manton's malevolence or Bacon's amorality.

*Need to Assure Public.* The need to assure the public of the fairness and honesty of the system has already been touched upon.

*Adverse Impact on Judicial Administration.* In addition to eroding the public's perception of fairness in justice and faith in the judiciary, a crime of this nature has an adverse impact on the exercise of discretion by at least some judges. Knowing that it is almost impossible to protect against unfair rumors of the acceptance of bribes, some judges at least will tend to "protect" themselves by failing to exercise leniency and by declining to cut through the red tape that often unnecessarily slows the disposition of cases.

■ *High Office of Trust.* The greater the trust placed in a public official, the more serious is a deviation from standards of fidelity. Judges should be punished more severely for taking bribes than are others. As one commentator noted:

> In sharp contrast to the common view that highly-placed or gifted men may disregard the laws of morality ... the greater a man's knowledge or position, the stricter the standard by which he is to be judged, and the greater the consequent guilt and punishment, if there is a falling away from that standard (S.R. Hirsch).

J.H. Hertz edition of the Pentateuch and Haftorahs, 445, n. 3 (1941).

## C. IRRELEVANT FACTOR—COERCION TO FORCE COOPERATION

The government has requested a sentence of imprisonment close to the maximum presumably in part to induce the defendant to cooperate with ongoing investigations by divulging information of assistance in exposing suspected corruption. In determining this sentence, the court takes judicial notice of the fact that there are currently afoot a number of investigations of alleged corruption in Queens.

■ Imposition of a heavy sentence greater than would otherwise be warranted, on the theory that it will be reduced pursuant to Rule 35 of the Federal Rules of Criminal Procedure if the defendant cooperates in the future investigations, is not appropriate. There are a number of reasons why coercive sentencing may not be used.

We note at the outset that the Comprehensive Crime Control Act amended Rule 35 to modify the sentencing judge's prior power to reduce a sentence on motion of either party. Pub.L. No. 98–473, Title II, §§ 215(b), 235, Oct. 12, 1984, 98 Stat. 2015, 2031. Rule 35, effective November 1986, now provides that the court may reduce the sentence only on motion by the government. This reduction may "reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense...." Fed.R.Crim.P. 35(b). The amendment recognizes that a defendant may choose to cooperate after conviction, as well as in the investigatory phase of a criminal prosecution. Rule 35(b), however, does not in any way authorize coercive sentencing to induce cooperation. It speaks only to the reduction of a sentence already imposed.

■ The concept of reduction as a reward, rather than enhancement as a punishment, has long been recognized. The Supreme Court has construed a defendant's willingness to cooperate as highly relevant in sentencing, because it is integral to the question of rehabilitation. A defendant who refuses to assist in an ongoing investigation distances himself from "the obligations of community life." *Roberts v. United States*, 445 U.S. 552, 558, 100 S.Ct. 1358, 1363, 63 L.Ed.2d 622 (1980). This alienation from a law-abiding future militates against leniency in sentencing.

The statutes and rules concerning the relationship of the court and the prosecution in the investigation of crimes and the use of witnesses suggest the proper procedure given the government's objectives. The prosecutor may arrange to call a defendant—including one already convicted—before the grand jury. If the defendant refuses to testify, he can be granted immunity pursuant to 18 U.S.C. § 6002. If the

witness then refuses to testify, or flouts the grand jury by refusing to state that which he or she obviously does recall, the witness can be cited for civil contempt. The witness may then be incarcerated until he or she testifies, for up to 18 months or for the life of the grand jury, whichever is less. *See* 28 U.S.C. § 1826(a).

There are other coercive procedures available to the prosecutor in order to obtain the cooperation of prospective witnesses. The prosecutor may, for example, point out the desirability of cooperation to avoid indictment or hold out the promise of a plea to a reduced offense. These are *prosecutorial, not judicial* tools.

The impropriety of the court's using a harsh sentence to coerce future cooperation must be contrasted with the technique of rewarding past cooperation. *See generally* Nemerson, Coercive Sentencing, 64 Minn.L. Rev. 669 (1980). Cooperation suggests contrition and indicates that the defendant has set his feet on the road to a law-abiding life. It also rewards help to the government—often under dangerous circumstances and after threats from criminals. Thus, in the sentencing of Anthony J. Bruno (*United States v. Bruno*, CR–85–0144) and Nicholas Botta (*United States v. Botta*, CR–85–0420), who cooperated in this case and testified for the government, the court gave favorable consideration to the government's request that these witnesses be treated leniently. Each of these witnesses received a suspended 5–year term of imprisonment and a $10,000 fine with probation. In connection with the *Botta* case, the court stated orally at the time of sentence:

> These public corruption cases, as the government pointed out, cannot be successfully prosecuted without the assistance of co-conspirators who are criminals. That is because these crimes are secret. It is essential, therefore, that criminals . . . be given some promise of lenient treatment in some case in order to induce them to come forward. The courts have acknowledged that cooperation is an appropriate consideration....

This reduced sentence serves as a signal to others in the ... criminal community, whose assistance will be required in ongoing and future investigations. The courts are not happy about their position in granting favors, in effect, to corrupt people, but ... the necessity of rooting out of public office corrupt and venal persons is so important that the Court has no alternative, as a practical matter, but to follow the recommendations in this case of the United States Attorney, and I so do.

Similarly, in the *Bruno* case, the court noted:

> The Court will follow the recommendation in this instance of the United States Attorney. The United States Attorney is charged with the investigation and prosecution and essentially the administration—from an executive point of view—of justice in this district. The United States Attorney is entitled to a good deal of discretion in investigation and in working out the arrangements with possible witnesses so that culpable people can be apprehended and removed from public office.

As suggested, the courts do not willingly embrace the role of indirectly coercing future defendants by implying that they will honor the inducements of the United States Attorney. In following such prosecutorial recommendations the judge takes a dangerous step—however small—out of his neutral path towards that of the prosecutor. That the courts have the power to follow such recommendations is clear. One form of the practice is embodied in Rule 11(e) of the Federal Rules of Criminal Procedure, covering approval by the court of a plea agreement.

This policy of rewards for acts of cooperation is quite different from sentencing a defendant, who continues to claim innocence, in a harsh and coercive manner in order to force him to give information the government seeks. As Professor Nemerson has put it, judges may not "view defendants as resources to be utilized without limitation, for the benefit of others."

**306**

Nemerson, *Coercive Sentencing*, 64 Minn. L.Rev. 669, 700 (1980). The Second Circuit has instructed:

> A defendant's cooperation may, of course, be taken into consideration by a sentencing judge as a mitigating factor tending to evidence his potential for rehabilitation.... On the other hand, a sentence may not, because of a defendant's refusal to cooperate, be increased or additional punishment imposed beyond what would otherwise have been meted out.

*United States v. Bradford*, 645 F.2d 115, 117 (2d Cir.1981), *citing DiGiovanni v. United States*, 596 F.2d 74 (2d Cir.1979); *United States v. Sweig*, 454 F.2d 181 (2d Cir.1972). *See also United States v. Ramos*, 572 F.2d 360, 363 n. 2 (2d Cir.1978) ("It is one thing to extend leniency to a defendant who is willing to cooperate with the government; it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense.")

The second reason coercion through sentencing is inappropriate in this case is that the government has never shown that the defendant had knowledge of any corruption other than that proved at the trial. Had the government other information, it could have asked for a *Fatico* hearing. *See United States v. Fatico*, 458 F.Supp. 388, 391–94 (E.D.N.Y.1978), *aff'd*, 603 F.2d 1053 (2d Cir.1979). At such a hearing the government may produce evidence relevant to the imposition of the sentence.

If the defendant has knowledge of other crimes and participated in those crimes, he shows a character defect graver than that revealed at the trial. Such evidence would warrant consideration of an additional term. Failure of the government to ask for a *Fatico* hearing suggests that there is no evidentiary basis at this time for a contention that defendant has committed other crimes.

This distinction between certainty and speculation about withheld testimony is illustrated in *Roberts v. United States*, where a defendant convicted of dealing in heroin implicated a purchaser but refused to name suppliers. 445 U.S. at 554, 100 S.Ct. at 1361. These suppliers necessarily existed; Roberts' crime could not have taken place without them. Similarly, in *United States v. Sweig*, 454 F.2d 181, 182–83 (2d Cir.1972), substantial evidence at trial showed that the defendant knew a great deal about ongoing corruption in the United States House of Representatives. A concurrence in *Roberts* emphasizes this point:

> [T]he problem of drawing inferences from an ambiguous silence is troubling. As a matter of due process, an offender may not be sentenced on the basis of mistaken facts or unfounded assumptions.... It is of comparable importance to assure that a defendant is not penalized on the basis of groundless inferences.

445 U.S. at 563, 100 S.Ct. at 1365–66 (Brennan, J., concurring).

## V. PENALTIES ASSESSED

■ Because of the importance of this case the usual practice of the court in consulting among the judges and with the Chief Probation Officer was modified. Before almost every sentence the sentencing judge consults with two other judges of the court and a probation officer after all of them have studied the presentence report. Views are exchanged both orally and in writing. No final decision is reached since the defendant is entitled to an allocation. Often the tentative sentence of the judge is modified and ameliorated by his consultation with other judges, by extensive discussion at the time of sentence and even by fact-finding hearings.

In this case the sentencing judge requested that additional members of the court participate in the sentencing panel. Among the judges there was no deviation from the view that a term of imprisonment was required. The sentence, however, is entirely the responsibility of the sentencing judge.

The court sentences the defendant to a five-year term of imprisonment, concurrent on counts 1, 2 and 26.

In addition, a consecutive term of imprisonment of five years, concurrent on counts 3–25, is imposed. Only this consecutive five-year term is suspended and the defendant is placed on probation for this additional five years. One of the conditions of probation is that defendant shall not directly or indirectly have anything to do with law enforcement or the practice of law nor shall he hold any office of public trust. Such a term of probation after imprisonment is required to ensure that there be no further corruption by the defendant and that the public need have no concern that he will further violate a public trust.

It is desirable to keep the sentence at the minimum necessary to achieve the desired objectives. There are two reasons for this constraint. First, the public pays the costs of any incarceration and period of probation; to administer more punishment than necessary is a drain on the taxpayer. Second, when society undertakes the role of punisher, it affirms its best values by minimizing pain and cruelty. *See* M. Foucault, *Discipline and Punish* 94 (1975).

Defendant is to forfeit the full amount that he received in bribes that the government seeks under RICO, namely $14,000.

Defendant is fined the full amount permitted by statute, namely $209,000, consecutive on all counts. There has been no claim that the counts in the indictment are duplicative. He shall, in addition, pay the mandatory special assessment of $1,300.

## VI. CONCLUSION

The defendant has betrayed the public trust and committed a long series of felonies. He is sentenced to five years in prison in addition to five years probation; denied the right to serve in a position of public office and trust; compelled to disgorge $14,000, the maximum amount recoverable as restitution and fined and assessed the maximum amount permitted by law, $210,300.

So ordered.