**EASTWAY CONSTRUCTION CORP., et al., Plaintiffs,**

v.

**The CITY OF NEW YORK, et al., Defendants.**

**No. CV–84–0690.**

United States District Court, E.D. New York.

May 23, 1986.

LaRossa, Mitchell & Ross, New York City by James LaRossa and John Mitchell, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City by John Woods, for defendants.

## TABLE OF CONTENTS

I. Facts & Procedural History ..... 562

II. Law ..... 563
 A. Purpose and Relationship of Rule 11 and 42 U.S.C. § 1988 ..... 563
 B. Role of the District Court ..... 565
 C. Issues in Imposing Rule 11 Sanctions ..... 566
 1. Objective and Subjective Standards ..... 566
 2. Due Process Right to a Hearing ..... 567
 3. Allocation of the Sanction Between the Attorney and the Client ..... 569
 4. Allocation of Rule 11 Sanctions by Cause of Action ..... 570
 5. Amount of the Sanctions ..... 571
 a. Expenditures of Party Seeking Sanctions - Lodestar Method and Market Rates ..... 571
 b. Mitigating Factors Leading to a Reduction of the Award ..... 572
 i. Subjective Factors - Generally ..... 572
 ii. Subjective Factors - Vindictiveness and Desire to Punish Opponent ..... 573
 iii. First Offenders and Others of Good Repute ..... 573
 iv. Ability to Pay ..... 573
 v. Need for Compensation ..... 574
 vi. Degree of Frivolousness ..... 574
 vii. The Importance of Not Discouraging Particular Types of Litigation ..... 575
 c. Award of Attorney's Fees for Time Spent on the Motion for Fees ..... 575
 d. Award of Attorney's Fees for Time Spent on Appeal ..... 576
 D. Awards of Attorney's Fees to Prevailing Defendants Under Section 1988 ..... 576

III. Law Applied to the Facts ..... 576
 A. Number of Compensable Hours and Allowable Maximum Hourly Rate ..... 577
 1. Time Spent on the Motion for Fees ..... 577
 2. Time Spent on the Appeal ..... 577
 3. Maximum Allowable Fee ..... 577
 B. Mitigating Factors ..... 578
 1. Subjective Factors ..... 578
 2. Frivolousness of the Complaint ..... 578
 a. The Antitrust Claim ..... 578
 b. The Due Process Claim ..... 581
 3. Need of Lawyer and Client for Punishment ..... 583
 4. Ability to Pay and Need for Compensation ..... 583
 5. Chilling This Type of Litigation ..... 583
 C. Allocation of Award of Attorney's Fees ..... 583

IV. Conclusion ..... 584

WEINSTEIN, Chief Judge:

This matter was remanded for the awarding of attorney's fees under Rule 11 of the Federal Rules of Civil Procedure and 42 U.S.C. § 1988. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985) (*"Eastway I"*). For the reasons indicated below, a modest portion of defendant's attorney's fees is assessed against the plaintiffs, while no fees are assessed against plaintiffs' counsel.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff Eastway Construction Corporation is a general contractor that during the 1960s and 1970s engaged exclusively in construction work on publicly financed housing rehabilitation projects in New York City. Plaintiffs Jaffee, Kanarek and Jacobs are officers of Eastway Construction Corporation. Collectively, plaintiffs are referred to in this opinion as "Eastway." (A more extensive statement of the facts than is needed for this phase of the litigation is set forth in *Eastway I.*)

Between 1966 and 1974, defendant City of New York ("City") loaned nearly twelve million dollars through a now defunct program to limited partnerships controlled by principals of Eastway Construction Corporation. The purpose of the loans was to enable the partnerships to rehabilitate thirty-four multiple dwelling buildings in depressed neighborhoods. The loans were generally non-recourse, secured only by mortgages on the buildings. The partnerships fell behind in their loan payments, so that by March 1983 all but three buildings had reverted to City ownership through default, and the remaining three buildings secured mortgage arrearages totaling about three million dollars.

In the early 1970s, the City's housing rehabilitation loan program was enveloped in corruption, with one City official being convicted of extortion and accepting bribes, and several developers being charged with fraud. Jaffee admitted making payments to a city official in an attempt to expedite the processing of pending loan applica-

tions. No criminal charges were brought against him or Eastway Construction Corporation. In response to this scandal, New York State revised its public housing finance laws. One part of the new statutory scheme gave the City the power to regulate the creation and operation of certain housing redevelopment companies and to control the identities of firms with which these redevelopment companies did business.

In the exercise of its new powers, the City decided that it would no longer enter into rehabilitation contracts with firms whose principals controlled entities that were in arrears or had defaulted on loans from the City. This policy prevented Eastway Construction Corporation from doing rehabilitation work directly for the City. In 1980 the City exercised its supervisory power over redevelopment companies and forbade them from entering into contracts with firms that the City refused to contract with. As a result Eastway was barred from doing any rehabilitation work for the City even indirectly.

Threatened with being forced out of business, Eastway went to the state court to challenge the City's policy, initiating an Article 78 proceeding that sought to have the policy declared "arbitrary and capricious." The state court challenge initially met with success, with the State Supreme Court granting summary judgment in Eastway's favor. On appeal, the Appellate Division reversed, *Eastway Construction Corp. v. Gliedman*, 86 A.D.2d 575, 446 N.Y.S.2d 306 (1st Dep.1982). No appeal was perfected to the Court of Appeals because, according to Eastway, it was then in the midst of attempting to negotiate a "work out" agreement to settle its differences with the City. The negotiations did at one point produce a tentative agreement. The City, however, ultimately refused to execute the agreement, and it never became effective.

Another major actor in the New York City housing rehabilitation arena is the Community Preservation Corporation ("CPC"), a private consortium of thirty-

nine banks that do business in the city. CPC extends low interest loans to private developers to facilitate the rehabilitation of multiple dwelling buildings in depressed neighborhoods. In June of 1978 and again in July of 1981, Everett Jennings, on behalf of Orange Realty Co., applied to CPC for a loan to be used to rehabilitate a building in Brooklyn. Although Orange Realty was affiliated with Eastway, the loan applications did not list Eastway as general contractor. Both loan applications were rejected.

Unable to secure work on either publicly or privately financed housing rehabilitation projects, Eastway commenced the present action in this court. The complaint stated two causes of action under federal law. The first was an antitrust claim, which alleged that the City and CPC had conspired to prevent Eastway from carrying on its business. The second was, in essence, a due process claim, which alleged that the City's policy had deprived Eastway of its rights without due process of law.

The municipal and private defendants each moved for summary judgment, and each requested an award of attorney's fees. In August 1984 this court granted both summary judgment motions and dismissed the action but denied the motions for attorney's fees, stating on the record that it found plaintiffs' claims were not frivolous. Eastway appealed the dismissal of its action, and the municipal defendants cross-appealed the denial of attorney's fees.

The Court of Appeals affirmed the dismissal, but characterized the claims as "groundless" for purposes of determining entitlement to attorney's fees. *Eastway I* at 252. It remanded for an award of attorney's fees to the municipal defendants. Costs incurred in defending the civil rights claim were to be assessed against plaintiffs alone under 42 U.S.C. § 1988, while costs incurred in defending the antitrust claim were to be assessed against plaintiffs or plaintiffs' counsel or both under Rule 11 of the Federal Rules of Civil Procedure. The case is therefore now before this court for

a determination of 1) the proper amount of attorney's fees to be awarded to the municipal defendants, and 2) the person or persons who should pay those fees.

## II. LAW

### A. *Purpose and Relationship of Rule 11 and 42 U.S.C. § 1988*

The traditional American rule is that each party to litigation bears its own costs, including attorney's fees. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). This furthers our policy, demonstrated also by fee absorption and other devices such as contingency fees, of keeping the courts as open as possible. Congress has over the years enacted numerous statutory exceptions to the general rule against fee-shifting. The courts, through rules and interpretation, have gradually expanded these exceptions.

Courts have quite properly distinguished between two different purposes of the fee-shifting statutes and rules. One purpose is to compensate *plaintiffs* for the actual cost of vindicating legal rights, by partial analogy to the English system, in order to encourage private attorney general suits in enforcement of important public policies. The second is to deter unfounded claims and defenses by assessing fees as a punitive measure. The second purpose is usually applied in favor of *defendants*, with the secondary effect of compensating the aggrieved litigant for legal fees that he should never have been forced to incur.

Prominent among statutes providing an incentive for private enforcement of federal law is the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982), which provides for grants of attorney's fees to successful parties in actions brought under 42 U.S.C. §§ 1981–1983 & 1985–1986 and other civil rights provisions. Similarly, the Civil Rights Act of 1964 contains a provision awarding attorney's fees to successful parties in actions brought under Title VII of the Act. *See* § 204(b) of

the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b)(1982); *Eastway I* at 252–54; *Erie Conduit Corp. v. Metropolitan Asphalt Paving Association,* 106 F.R.D. 451, 455–56 (E.D.N.Y.1985) (Maletz, J.) (discussion of statutory and judicial exceptions to the American Rule).

In applying these statutes to determine when to make awards of attorney's fees to plaintiffs, courts have been quite liberal, concluding that attorney's fees are routinely available to all prevailing plaintiffs. There are two reasons for such openness. "First, ... the plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.' Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978), *quoting Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (citation omitted). The plaintiff, in short, is acting as a private attorney general, and such behavior is to be encouraged by liberal compensation. *See Copeland v. Marshall,* 641 F.2d 880, 899 (D.C. Cir.1980) ("The purpose of Title VII's fee award provision ... is to encourage the private enforcement of the civil rights laws.").

In addition to fee-shifting provisions that are intended to encourage the bringing of some lawsuits, there are provisions intended to deter the bringing of others. It is these provisions that are of primary interest in this case. Among them are the two provisions just discussed, 42 U.S.C. § 1988 and 42 U.S.C. § 2000a–3(b), as applied in determining whether to award fees to prevailing *defendants,* as well as Rule 11 of the Federal Rules of Civil Procedure. The purpose of these provisions is to discourage litigants from bringing frivolous cases or making frivolous motions.

Because such provisions 1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to breed time-consuming and expensive satellite litigation, and 3) increase tensions among the litigating bar and between bench and bar, the standard for imposition of sanctions is high. The provisions do not entitle all prevailing defendants to an award of fees; instead, fees are to be awarded only if the claim or motion was entirely unjustified, i.e., frivolous. Although they do contain a compensation element, the primary purpose of this group of provisions is deterrence. *See, e.g., Advisory Committee Notes to Rule 11* ("The word 'sanctions' in the caption ... stresses a deterrent orientation in dealing with improper pleadings, motions or other papers."); S.M. Kassin, *An Empirical Study of Rule 11 Sanctions* at 29 (Federal Judicial Center 1985) ("[T]he majority of judges ... expressed a belief that deterrence is the most important purpose of sanctions."); *Carrion v. Yeshiva University,* 535 F.2d 722, 727 (2d Cir.1976) (in passing § 706(k) and allowing for awards of attorney's fees to defendants, "Congressional intention was to ... discourage baseless or frivolous actions"; power to be "sparingly exercised"); *Rapisardi v. Democratic Party of Cook County,* 583 F.Supp. 539, 543–44 (N.D.Ill.1984) (court granted defendants attorney's fees of a modest amount under 42 U.S.C. § 1988, stating that an award of that size "accomplishes the deterrent purpose of the statute, [and] affords the defendant some compensation"); *Kostiuk v. Town of Riverhead,* 570 F.Supp. 603, 612–13 (E.D.N.Y. 1983) (court granted defendants nominal fees under § 1988, stating that the amount was "not intended to ... fully compensate defendants," but that it would hopefully be "sufficient to serve as a caution to potential litigants with similar claims"). *Cf. Taylor v. Prudential-Bache Securities, Inc.,* 594 F.Supp. 226 (N.D.N.Y.), *aff'd mem.,* 751 F.2d 371 (2d Cir.1984) (purposes of Rule 11 are deterrence and compensation); *Index Fund Inc. v. Hagopian,* 107 F.R.D. 95 (S.D.N.Y.1985) (though Rule 11 is intended both to deter and to compensate, court awarded only nominal fees of $100).

While none of the deterrence-oriented provisions actually uses the word "frivolous," courts nonetheless consistently employ a "frivolousness" standard in determining whether an award of fees is appropriate. To properly inform the bar, simplify administration, and maximize substantive impact, it is advisable that the degree of frivolousness needed to trigger sanctions under each of these provisions be the same.

"Frivolous" is of the same order of magnitude as "less than a scintilla." It is defined in Webster's Third New International Dictionary (1967) as "of little weight or importance: having no basis in law or fact: light, slight, sham, irrelevant, superficial." The Oxford English Dictionary (1971) defines it as "[o]f little or no weight, value or importance; paltry; trumpery; not worthy of serious attention; having no reasonable ground or purpose ... In pleading: Manifestly insufficient or futile."

■ If a claim is deemed frivolous for the purpose of imposing sanctions under Rule 11, it should also be considered frivolous for the purpose of imposing sanctions under section 1988. At least one court of appeals has expressly endorsed the application of a uniform standard for determining frivolousness. *See Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 & n. 8 (9th Cir.1986) ("[T]he district court correctly adopted and applied for purposes of Rule 11 sanctions the standard applicable for the award of fees to prevailing defendants under the civil rights acts.... The same standard is applied to the award of fees under the Securities Exchange Act of 1934, 15 U.S.C. § 78i(e) (1982) and the Securities Act of 1933, 15 U.S.C. § 77k(e) (1982)."); *see also Nemeroff v. Abelson,* 620 F.2d 339, 350 (2d Cir.1980) (applying *Christiansburg* standard to requests in securities actions for attorney's fees under 15 U.S.C. § 78i(e)).

### B. *Role of the District Court*

■ Once a trial court determines that a claim or motion fails to meet the standard for nonfrivolousness, the court of necessity has a great deal of discretion in deciding on the nature of the sanction, and if it be an award of attorney's fees, how much to award. This is because the trial court's role is to provide the "appropriate" deterrent. Rule 11 of the Federal Rules of Civil Procedure for the United States District Courts is directed to the trial judge. It requires that the trial court "impose ... an appropriate sanction."

■ Punishment should never exceed the amount required to achieve the result desired. A deterrent is therefore appropriate when it is the minimum that will serve to adequately deter the undesirable behavior. *See U.S. v. Brennan,* 629 F.Supp. 283, 307 (E.D.N.Y.1986); Nemerson, *Coercive Sentencing,* 64 Minn.L.Rev. 669 (1980); *see also* Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 201 (1985) ("The basic principle governing the choice of sanctions is that the least severe sanctions adequate to serve the purpose should be imposed."); *Advisory Committee Notes to Rule 11* ("The court ... retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case...."); *Faraci v. Hickey Freeman Company, Inc.,* 607 F.2d 1025, 1028 (2d Cir.1978) ("Recent legislation extending the power of the federal courts to award attorneys' fees by no means requires abandonment of the equitable principles that have traditionally governed a court's discretion in such matters. On the contrary, the express grant of authority to award fees presumes continued application of equitable considerations in appropriate cases, both to effectuate the broader legislative purpose and to do justice in the particular case."); *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1013 (S.D.N.Y.1982) ("the equities of the situation are to be considered to ensure that although the deterrent purpose of the statute [§ 706(k)] is enforced, a losing party is not subjected to financial ruin"); *Rapisardi v. Democratic Party of Cook County,* 583 F.Supp. 539, 543 (N.D.Ill.1984) ("In the court's discretion [under § 1988] to determine the

amount of the fee to be awarded [to the defendants], small as well as large fees are permissible.").

Rule 11 on its face grants the trial judge the discretion not only to decide how much attorney's fees to award, but also whether or not to grant attorney's fees at all. The Rule states that when a filing is determined to be frivolous, the court "shall" impose sanctions, which sanctions "may"—not must—include an order to pay the other party's expenses. Other sanctions such as a reprimand or an order that the attorney take certain remedial courses or consult with skilled attorneys or attend court sessions are all available in place of a monetary award.

Recognizing that trial courts must have great discretion in fashioning proper sanctions under deterrence-oriented fee-shifting provisions, appellate courts have enunciated an "abuse of discretion" standard for reviewing specifics of fee awards. *See, e.g., Eastway I* at 254 n. 7 ("In reviewing the specifics of an award [under Rule 11] of attorneys' fees, ... we shall continue to adhere to the 'abuse of discretion' standard."); *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 828 (9th Cir.1986) ("[I]f the appropriateness of the [Rule 11] sanction imposed is challenged, we review the sanction under an abuse of discretion standard."). This practice and standard placing primary reliance on trial court discretion has been applied to a wide range of deterrence-oriented provisions. *See Zaldivar,* 780 F.2d 823, 828 n. 4, and cases cited therein. Necessarily, the district court will have a better grasp of what is acceptable trial-level practice among litigating members of the bar than will appellate judges. *Cf. Garguil v. Tompkins,* 790 F.2d 265, 272 (2d Cir.1986) ("District Judge, whose experience with New York law deserves deference"); *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ In addition, where the decision whether to impose any sanctions rests on resolution of factual issues, i.e., whether an attorney conducted the "reasonable inquiry" required by Rule 11, the trial court's findings are reviewed under the "clearly erroneous" standard. *See Zaldivar,* 780 F.2d 823, 828; *see also Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174–75 (D.C.Cir. 1985); *see generally Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (requiring deference to trial court's findings of fact).

### C. Issues in Imposing Rule 11 Sanctions

(1) Objective and Subjective Standards.

Rule 11 read literally contains both subjective and objective components. In pertinent part, it states:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record.... The signature of an attorney ... constitutes a certificate by him that he has read the pleading, motion, or other paper; that *to the best of his knowledge, information, and belief* formed after *reasonable inquiry* it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.... If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

(Emphasis added). The text suggests that the obligation imposed by the Rule is partly objective, and partly subjective. The requirement that the attorney base his certification on a "reasonable inquiry" is objective, because what is "reasonable" is judged by objective norms of reasonable attorneys. But the certification itself need only state that the motion is well grounded "to the best of [the attorney's] knowledge, information, and belief." Since the certifi-

cation relates to the attorney's own beliefs, it appears that it should be judged by a subjective standard. Even the subjective component has objective aspects since, as a matter of evidence, the judge will rely on what reasonable lawyers would have known or believed under the circumstances in deciding what this lawyer believed.

■ The objective "reasonable inquiry" element of Rule 11 serves to protect attorneys who reach reasonable, but erroneous, conclusions about the validity of their cases. Before a suit is filed, often only a limited investigation into the law and facts is possible. If an attorney makes a reasonable investigation under the circumstances and concludes based on that investigation that the pleading is well grounded in law and fact, he cannot be sanctioned for filing the pleading when time and discovery prove that the plaintiff does not in fact have a viable claim. *See Advisory Committee Notes to Rule 11* ("[W]hat constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer ... [and] whether he had to rely on a client for information as to the facts underlying the pleading...." ).

A more difficult question is whether the apparently subjective element of Rule 11 can protect attorneys who honestly reach unreasonable conclusions about the factual or legal strength of their cases. What if an attorney conducts a reasonable inquiry into the facts and the law and concludes, honestly but mistakenly, that the law supports his pleading, even though the pleading would be recognized as plainly frivolous by a minimally competent member of the bar? A literal reading of the Rule would indicate that such conduct is not sanctionable because the attorney has clearly complied with the letter of the Rule: he has certified that to the best of his knowledge, information and belief, formed after a reasonable inquiry into the facts and the law, that the pleading is well grounded. This reading is also supported by the rationale behind the Rule, namely deterrence. While sanctioning an attorney's failure to make a reasonable inquiry

might make him more diligent in the future, sanctioning honest errors is unlikely to prevent their recurrence. *Cf.* The American Law Institute, *Model Penal Code Tentative Draft No. 4*, at 140 (1955) ("In the absence of minimal culpability, the [criminal] law has neither a deterrent nor corrective nor an incapacitative function to perform.").

*Eastway I* holds that policy requires that Rule 11 not be read according to its literal terms. In a telling paraphrase of the language of Rule 11, the Second Circuit restated the requirement of the Rule as follows: "[S]anctions shall be imposed [if], after reasonable inquiry, a *competent* attorney could not form a *reasonable* belief that the pleading is well grounded in fact and is warranted by existing law...." *Eastway I* at 254 (emphasis added). While the Rule requires certification only by the actual attorney of his actual beliefs, *Eastway I* requires the reasonable beliefs of a hypothetical competent attorney. The Second Circuit's restatement of the rule effectively eliminates the subjective element incorporated by the drafters of the Rule. As a result, an attorney's erroneous conclusion that a pleading is well grounded may lead to sanctions. *Eastway I,* in other words, holds attorneys strictly liable for mistakes in judgment that lead to the filing of papers later deemed frivolous. *Accord, Wells v. Oppenheimer & Co., Inc.,* 101 F.R.D. 358, 359 & n. 3 (S.D.N.Y.1984), *vacated on other grounds,* 106 F.R.D. 258 (S.D.N.Y.1985); *but cf. Baranski v. Serhant,* 106 F.R.D. 247 (N.D.Ill.1985) (mistake can be a defense to Rule 11 motion). While application to lawyers of a penal rule from which mens rea has been eliminated is inconsistent with American penal and professional traditions, the courts of this circuit are bound by *Eastway I.*

(2) Due Process Right to a Hearing.

Rule 11 does not address the issue of the procedural rights of attorneys and clients who are being sanctioned. The Advisory Committee Notes to Rule 11 contains a mixed message about procedural rights.

While the Notes comment that "[t]he procedure obviously must comport with due process requirements," they go on to suggest that procedural safeguards should be kept to a minimum:

To assure that the efficiencies achieved through more effective operation of the pleading regimen will not be offset by the cost of satellite litigation over the imposition of sanctions, the court must to the extent possible limit the scope of sanction proceedings to the record.

*Id.* In the absence of specific instructions from the Rule, our discussion of the due process issue must be based on general principles.

Due process requires, at a minimum, notice and an opportunity to be heard "appropriate to the nature of the case." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), *quoting Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). In the case of sanctions this would seem always to require that the attorney be given notice of the motion for fees and have an opportunity to address the court before sanctions are imposed. The Supreme Court has endorsed this notion. In *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980), it noted that like other sanctions, "attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record". *See also, e.g.,* The Committee on Federal Courts, *Procedural Rights of Attorneys Facing Sanctions,* 40 The Record 313, 323 (1985); *cf. Adamsons v. Wharton,* 771 F.2d 41, 43 n. 4 (2d Cir.1985).

The constitutional mandate that the due process rights be appropriate to the nature of the case also requires that an evidentiary hearing be held if necessary. An evidentiary hearing will be necessary "when the imposition of the sanction is dependant upon facts genuinely in dispute." The Committee on Federal Courts at 323–24. *See also* Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 198 (1985) (evidentiary hearing "should be

avoided, unless the court must find disputed facts or resolve issues of credibility."). An analysis of the Rule shows that in many Rule 11 cases the potential exists for factual disputes that would entitle an attorney to request an evidentiary hearing.

As pointed out earlier in this opinion, there are two basic ways in which Rule 11 might be violated. First, an attorney might violate the Rule by failing to make a reasonable inquiry into the facts and law. Second, according to *Eastway I,* an attorney might also violate the Rule by failing to draw the "reasonable" conclusions that a "competent" attorney would have reached.

In the first type of Rule 11 violation, it is obvious why there may be genuine factual disputes: the nature of the inquiry actually conducted is an issue of fact. In other words, whether sanctions ought be imposed may depend on disputed facts about what kind of inquiry was made.

In the second type of Rule 11 violation, the decision whether or not to impose sanctions does not depend on any facts relating to the attorney's investigation or reasoning. Presumably a judge can take judicial notice of what a reasonable attorney should know. *See Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 205–206 (7th Cir.1985) (no hearing needed when complaint was legally deficient and "overblown"); *cf.* Federal Rules of Evidence, Rule 201. Appropriate modesty would, even here, in many cases suggest that generalist federal judges might not be fully aware of what reasonable and competent members of the bar consider a reasonable conclusion. A hearing would thus be required in many instances even under the objective test.

Hindsight rationalizations for finding frivolousness must constantly be guarded against. *See Advisory Committee Notes to Rule 11* ("the court is expected to avoid using the wisdom of hindsight"); *Erie Conduit Corp. v. Metropolitan Asphalt Paving Association,* 106 F.R.D. 451, 459 (E.D.N.Y.1985) (Maletz, J.). Judicial opinion-writing style is well-known; after the

judge equivocates in chambers and cogitates, with the decision wavering in the balance, the opinion is written in an adversarial fashion as if the court never had been dubitante and the outcome was always inevitable. This is deemed necessary, perhaps, on the theory that the law must seem certain to be respected. *See* K.N. Llewellyn, *The Common Law Tradition: Deciding Appeals* 24 (1960).

■ Even if, as required by *Eastway I,* a strict liability standard for attorney errors is imposed, and even if it is imposed without hearing, there is the issue of the *amount* of sanctions to be imposed. This decision may well depend on the factual circumstances that led to the attorney's mistake. As will be developed below, many factors may justify the court's mitigating the severity of the sanctions imposed. On this issue an attorney must be given the opportunity to present evidence to the trial court before he or she or the client is severely sanctioned. *See* The Committee on Federal Courts, *Procedural Rights of Attorneys Facing Sanctions,* 40 The Record 313, 326 (1985).

### (3) Allocation of the Sanction Between the Attorney and the Client.

Rule 11 authorizes the trial court to impose sanctions upon the attorney, his client, or both, but provides no standards to guide the court's decision as to how the allocation should be made. Both courts and commentators have suggested that the court should direct sanctions at whoever is responsible for the filing of the frivolous paper. *See Weisman v. Rivlin,* 598 F.Supp. 724, 727 n. 4 (D.D.C.1984) (sanctions assessed against attorney, because "that is where the fault lies"); The Committee on Federal Courts, *Procedural Rights of Attorneys Facing Sanctions,* 40 The Record 313, 325 (1985) (court should "allocate the imposition of sanctions between an attorney and his client based upon their culpability").

In practice, assessment of fault between attorney and client is rather difficult. There are some cases in which it is fairly clear who should be sanctioned. For example, the attorney alone is generally responsible for sharp practice, such as a frivolous motion to disqualify opposing counsel. *See Wold v. Minerals Engineering Co.,* 575 F.Supp. 166 (D.Colo.1983) (sanctions for frivolous motion to disqualify counsel imposed against attorney alone). And where the client misleads his attorney and thus causes him to file frivolous papers, it is apparent that the client, not the attorney, should be sanctioned. *See Friedgood v. Axelrod,* 593 F.Supp. 395 (S.D.N.Y.1984) (where plaintiff lied to his attorney leading to frivolous civil rights lawsuit, sanctions imposed against plaintiff under 42 U.S.C. § 1988, but no sanctions imposed against attorney under Rule 11). Most cases, however, will not fall into either extreme, leaving the court with a great deal of discretion and very little direction in allocating sanctions. *Cf.* Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 203 (1985) (suggesting that where the violation reflects deliberate litigation strategy, court should assess joint and several liability).

■ Even this analysis, modest as it is, is not quite accurate. In the case in which it was suggested that fees be assessed against the client alone, Rule 11 does not—technically speaking—even apply. Rule 11 does not, by its terms, provide for sanctions against the filing of frivolous papers. Rather, it provides for sanctions against an attorney's filing papers without making an adequate inquiry. In a case in which an attorney makes a reasonable inquiry into the facts but still ends up filing a frivolous pleading because his client deceived him, there has technically not been any violation of Rule 11. Consequently, there is technically no basis for the imposition of sanctions, even against the client who in bad faith induced the filing a frivolous suit. This conclusion, however, is completely at odds with the spirit of the Rule. It would also lead to bizarre consequences, because it would mean that clients could be sanctioned in cases where they were partially responsible for filing frivolous papers, but

not in cases where their responsibility was total. The better conclusion is that sanctions may be imposed against the client under the circumstances described above despite the flaw in the Rule's language.

As the trial court attempts to determine fault and allocate fees on that basis, the risk of creating substantial satellite litigation at great cost to the parties increases. First, there is a problem because of conflict of interest. If attorney and client disagree about who is at fault and point their fingers at each other, the interests of the two are now clearly adverse. The client, therefore, will need new counsel to represent him against his former counsel in the proceedings to determine fault. *See* Schwarzer, *Sanctions Under the New Federal Rule 11*, 104 F.R.D. 181, 199 (1985) (noting potential for conflict between client and attorney, and also between co-counsel). Second, the question of who is at fault is likely to involve disputed issues of fact, making further evidentiary hearings necessary. *See* The Committee on Federal Courts, *Procedural Rights of Attorneys Facing Sanctions*, 40 The Record 313, 325 (1985). The implications of such a hearing, turning attorney against client, and the effect on attorney-client privilege and trust, may be devastating. *Cf.* Proposed Rules of Evidence for United States Courts and Magistrates, Rule 503(d)(3), 56 F.R.D. 183, 236 (1973) (lawyer-client privilege is inapplicable where there has been a breach of duty by the lawyer or client).

The reverse scenario, in which attorney and client not only do not contest relative fault before the court, but have agreed between themselves to privately reallocate any sanction imposed against them, may also present problems. The attorney and his client do not stand as equals before the court. Sanctions are imposed against the client purely for their deterrent effect. But sanctions are imposed against the attorney also for disciplinary purposes, as a punishment for dereliction of duty by an officer of the court who should know better. Allowing the client to reimburse the attorney would interfere with the court's attempt to maintain discipline. Therefore, reimbursement by the client should be prohibited. *See* Schwarzer, *Sanctions Under the New Federal Rule 11*, 104 F.R.D. 181, 203 (1985); *Wold v. Minerals Engineering Co.*, 575 F.Supp. 166, 168 (D.Colo.1983). An attorney's agreement to reimburse his client presents no analogous problems, and therefore need not under usual circumstances be interfered with. Unless, therefore, the court explicitly rules otherwise, the attorney may assume fees assessed against the client, but the client may not pay fees imposed on the attorney.

### (4) Allocation of Rule 11 Sanctions by Cause of Action.

Rule 11 provides that the court may assess fees to cover "reasonable expenses [including attorney's fees] incurred because of the filing of the [frivolous] pleading, motion, or other paper...." Since fees may be assessed only for frivolous filings, it may be necessary to analyze the contents of a filing and examine each of its constituent parts to determine the proper amount of the fee award. If, for example, a pleadings states two unrelated causes of action, one of which is frivolous and one of which is not, attorney's fees may be assessed only for the time spent responding to the frivolous part of the pleading. *See Weisman v. Rivlin*, 598 F.Supp. 724, 726 (D.D.C. 1984) ("the rule requires that the work expended be causally linked to the improperly filed paper"); Schwarzer, *Sanctions Under the New Federal Rule 11*, 104 F.R.D. 181, 203 (costs "not attributable to the offending paper must be segregated and excluded from the award"); *see also Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (where plaintiff in civil rights action prevailed only on some of his claims, he was not entitled under section 1988 to attorney's fees on the unsuccessful claims). Analyzing filings in this way may require further hearings with extensive and difficult analysis of an attorney's time records, but there is generally no alternative under the Rule. *Cf. Hensley*, 103 S.Ct. at 1940 (Supreme Court expresses the hope that "cases involving such unrelated claims

[will be] unlikely to arise with great frequency").

### (5) Amount of the Sanctions.

■ Determining the kinds of sanctions and the amount of fees, if any, to be imposed requires consideration of the following factors: a) the cost of the Rule 11 violation to the party seeking sanctions, and b) mitigating factors such as (i) whether the client and lawyer believed they were correct in taking the course they did; (ii) whether there was vindictiveness or a desire to punish an opponent; (iii) whether the lawyer is a neophyte who needs education, a repeat offender, or a person of standing at the bar whose actions have heretofore been ethical and in the high tradition of the bar; (iv) the ability to pay; (v) the need for compensation; (vi) the degree of frivolousness; and (vii) the dangers in chilling the particular kind of litigation involved. In addition, there are questions relating to compensation for time spent on Rule 11 sanction litigation and on appeals.

### (a) Expenditures of party seeking sanctions—lodestar method and market rates.

■ The logical starting point for a determination of attorney's fees is a calculation of the number of hours reasonably expended in responding to the frivolous paper, multiplied by a reasonable hourly attorney's fee based on the prevailing market rate. *See, e.g., Perez v. Velez,* 629 F.Supp. 734 (S.D.N.Y.1985) (market rates awarded to Corporation Counsel). This may be adjusted upward as a reward for work of exceptional quality. *See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). That is the approach used to determine awards of attorney's fees to prevailing plaintiffs under section 1988, even when the plaintiff is represented by a nonprofit legal service organization, rather than by counsel paid a fee based on an hourly rate. *See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The plaintiffs in this case urge that Rule 11 does not contemplate the award of market-based rates to parties who are represented by in-house counsel, as was the defendant seeking fees in this case. They point first to the wording of Rule 11, which speaks of "expenses incurred ... including a reasonable attorney's fee," as opposed to section 1988, which simply "allow[s] the prevailing party ... a reasonable attorney's fee as part of the costs." The argument goes that the "incurred" language in Rule 11 prevents the court from awarding more than the party's actual cost. This contention is not persuasive because nothing in the Rule or the Advisory Committee Notes suggests that the inclusion of that single word was intended to completely alter the usual method of calculating attorney's fees. Courts have applied caselaw developed under section 1988 to other differently-worded fee statutes, discounting arguments that slight differences in wording should make a difference. *See, e.g., Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania,* 762 F.2d 272, 275 (3d Cir.1985) (applying caselaw developed under section 1988 to fee award provision of the Clean Air Act, which speaks not of "costs," but of "costs of litigation"), *cert. granted,* —— U.S. ——, 106 S.Ct. 57, 88 L.Ed.2d 46 (1986).

Practical problems of administration suggest that a single readily ascertainable market rate be applied where possible. *See In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1296, 1308–09 (E.D.N.Y.1985). This approach would treat inside, public, and eleemosynary counsel in the same way, at least in determining a lodestar figure.

Plaintiffs also attempt to distinguish existing section 1988 caselaw on policy grounds. Nearly all the cases allowing market rates to parties represented by nonprofit counsel in civil rights actions involve prevailing plaintiffs. As was noted earlier, section 1988 as applied to plaintiffs is a litigation-encouraging provision; Rule 11, by contrast, is a litigation-deterring provision. Market-based fees are awarded to prevailing plaintiffs in section 1988 cases, even where they exceed cost, because we

wish to encourage such suits. Since this reasoning is inapplicable to awards under Rule 11, the submission is, only cost-based fees should be allowed.

 While this argument has obvious weight, it is not convincing. Granted that the purpose of Rule 11 is deterrence; this still does not prove that only cost-based rates are appropriate. There might certainly be cases in which an attorney's conduct is so egregious that the only appropriate sanction is one that is well above the actual monetary damage caused by the frivolous filing. The deterrent nature of the Rule, therefore, does not preclude a market-based fee award to a party represented by in-house counsel. *Cf.* Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 202 (1985) (discussing the use of fines unrelated to attorney's fees as a sanction under Rule 11); *Donaldson v. Clark,* 786 F.2d 1570 (11th Cir.1986) (approving imposition of fines under Rule 11); *Dore v. Schultz,* 582 F.Supp. 154 (S.D. N.Y.1984) (imposing $250 fine under Rule 11).

(b) Mitigating factors leading to a reduction of the award.

While agreeing on the propriety of starting the calculation of an award of attorney's fees by multiplying a reasonable number of hours by a reasonable hourly rate, courts have not ended their inquiries at that point. Without explaining why they are doing it—and often without even noting that they are doing it—courts have reduced their awards of fees to prevailing defendants in both Rule 11 and section 1988 cases. In many cases a nominal award results. *See, e.g., Index Fund v. Hagopian,* 107 F.R.D. 95 (S.D.N.Y.1985) ($100 award under Rule 11); *Heimbaugh v. City of San Francisco,* 591 F.Supp. 1573 (N.D.Cal.1984) ($50 award under Rule 11); *Weisman v. Rivlin,* 598 F.Supp. 724 (D.D. C.1984) ($200 awarded under Rule 11, where over $4,000 was requested); *Kuzmins v. Employee Transfer Corp.,* 587 F.Supp. 536 (N.D.Ohio 1984) ($100 awarded under section 1988); *Kostiuk v. Town of*

*Riverhead,* 570 F.Supp. 603, 612 n. 4 (E.D. N.Y.1983) ($250 awarded under section 1988, even though it was "beyond dispute that the actual legal expenses of ... defendants far exceeded this amount"); *see also Taylor v. Prudential-Bache Securities, Inc.,* 594 F.Supp. 226, 228–29 (N.D.N. Y.), *aff'd mem.,* 751 F.2d 371 (2d Cir.1984) ("While ... the Court views the request [under Rule 11] as both a realistic and a reasonable one, it will nonetheless reduce the award substantially."). This unbroken line of authority requires us to consider the factors apart from the lodestar figure that courts must take into account in determining monetary Rule 11 sanctions.

(i) *Subjective Factors—Generally.* As was demonstrated earlier, Rule 11, at least as interpreted by the Second Circuit in *Eastway I,* uses a purely objective standard amounting in many cases to strict liability to determine *when* to impose sanctions. But a pure strict and unmitigated liability standard in determining *the form* of the sanctions in Rule 11 cases is inappropriate. Because the purpose of Rule 11 is deterrence through punishment, the Rule is quasi-criminal. It is well established in Anglo-American law that strict liability is used in criminal law only in narrow circumstances; in most cases, the defendant's mens rea is a focal point of the law's inquiry. By analogy, in fixing a penalty, the law must be reluctant to ignore the state of mind of the attorney being sanctioned in Rule 11 cases. Since state of mind is not a factor in determining whether the Rule has been violated, it must be introduced in the second stage of the proceeding, and given weight in deciding on the severity of the sanctions. As Professor Kassin pointed out in an excellent study of Rule 11:

[I]t seems reasonable to propose a bifurcated task that explicitly distinguishes the dual requirements that sanctions be "mandatory" (a statement of whether they should be imposed) and "appropriate" (a statement of severity). Essentially, this kind of approach would enable courts to resolve the conflict by granting sanctions according to a strict objective

standard, but then engaging subjective-faith considerations in setting an amount.

S.M. Kassin, *An Empirical Study of Rule 11 Sanctions* at 45 (Federal Judicial Center 1985).

(ii) *Subjective Factors—Vindictiveness and Desire to Punish Opponent.* It is widely agreed that the "wilfulness" of the violation is of major importance. *See, e.g., Friedgood v. Axelrod,* 593 F.Supp. 395, 397 (S.D.N.Y.1984) (court can consider plaintiff's "vindictiveness"); *Weisman v. Rivlin,* 598 F.Supp. 724, 727 (D.D.C.1984) (award reduced because only negligence, not wilfulness, shown); *Rapisardi v. Democratic Party of Cook County,* 583 F.Supp. 539, 543 (N.D.Ill.1984); *Advisory Committee Notes To Rule 11* ("[I]n considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed."). Issues involved in determining willfulness include whether the attorney or client knew the filing was frivolous, whether the filing was used to harass or punish the opposing party, and whether the offending party unnecessarily increased the cost of litigating the filing at issue.

(iii) *First Offenders and Others of Good Repute.* Other factors should be considered as well. For example, the court should be more lenient with first offenders with an otherwise good reputation than with an attorneys or clients who have a history of filing frivolous actions. *See In re Itel Securities Litigation,* 596 F.Supp. 226, 235 (N.D.Cal.1984) (court's decision to impose heavy sanctions on plaintiff's counsel based in part on his "history in this type of litigation"). Some younger members of the bar need assistance in avoiding future delicts and the court should educate rather than punish them. Other lawyers may be distinguished and ethical members of the bar who slipped on a single occasion and need no punishment to prevent future problems.

Similarly, where a filing has been deemed to be legally, as opposed to factually, frivolous, the court should be more lenient on nonspecialists than on attorneys who have great expertise in the area of law involved, although there are circumstances where the attorney should have been aware that a specialist should have been consulted. *See Advisory Committee Notes to Rule 11.* As Judge Schwarzer points out:

While all attorneys practicing in the federal court are subject to its rules, it is not realistic to hold all to the same standards. For example, a failure to cite contrary authority may be excusable neglect in the case of an inexperienced solo practitioner but amount to serious misconduct if perpetrated by a lawyer from a large, well-equipped law firm engaged in a substantial matter. Similarly, violations by persons appearing pro se must be judged differently from those of lawyers.

Thus a violation may stem from a variety of causes: inexperience, incompetence, neglect, wilfulness or deliberate choice. The need for punishment and deterrence is a function of the cause of the violation. In assessing the cause, the judge should consider not only the circumstances of the particular violation but also the factors bearing on the reasonableness of the conduct, such as experience and past performance of the lawyer and his firm, and the general standard of conduct of the bar of the court.

Schwarzer, *Sanctions Under the New Federal Rule 11,* 104 F.R.D. 181, 201 (1985).

(iv) *Ability to pay.* The deterrent effect of an award of attorney's fees of a given sum of money is obviously dependent on the extent of the sanctioned party's resources. The poorer the offender, the smaller need be the sanction to ensure the desired deterrent effect. *See e.g., Oliveri v. Thompson,* CV–83–3572 (E.D.N.Y. Dec. 23, 1985) (reducing sanction against attorney from $51,000 to $5,000 because of his financial condition). Accordingly, many courts have reduced fee awards based on ability to pay. Most of these cases arise under section 706(k) of the Civil Rights Act

of 1964 or under section 1988, because these provisions require that the sanction be imposed only against the client, and not against the attorney, and plaintiffs with civil rights claims usually are poorer than attorneys subject to Rule 11 sanctions. Rule 11 cases in which the issue arises usually involve pro se plaintiffs. *See, e.g., Faraci v. Hickey Freeman Co., Inc.,* 607 F.2d 1025 (2d Cir.1979) (section 706(k) award); *Colucci v. New York Times Co.,* 533 F.Supp. 1011 (S.D.N.Y.1982) (same); *Kostiuk v. Town of Riverhead,* 570 F.Supp. 603 (E.D.N.Y.1983) (section 1988 case); *Kuzmins v. Employee Transfer Corp.,* 587 F.Supp. 536 (N.D.Ohio 1984) (same); *Taylor v. Prudential-Bache Securities,* 594 F.Supp. 226 (N.D.N.Y.), *aff'd mem.,* 751 F.2d 371 (2d Cir.1984) (Rule 11 case, pro se plaintiff); *Heimbaugh v. City of San Francisco,* 591 F.Supp. 1573 (N.D.Cal. 1984).

(v) *Need for Compensation.* The other side of the ability to pay concept is the defendant's need for compensation. A single suit of modest proportions will be insignificant to a major corporation while such a suit against an individual may have crushing economic effect. This factor needs to be taken into account both to deter harassment of weaker defendants as well as to reduce any unnecessary burdens on plaintiff or his counsel.

(vi) *Degree of frivolousness.* Court opinions on attorney's fees speak easily of cases being either frivolous or nonfrivolous, as if all cases fit easily into one or the other category. Reality is more complicated. In the legal world, claims span the entire continuum from overwhelmingly strong to outrageously weak. Somewhere between these two points, courts draw a line to separate the nonfrivolous from the frivolous, the former category providing safe shelter, the latter subjecting attorney and client to sanctions.

Attorneys are thus placed in a dilemma because they have the right—in fact, they have an ethical obligation (subject to tactical considerations)—to present to the court all the nonfrivolous arguments that might be made on their clients' behalf, even if

only barely nonfrivolous. They are forced by their position as advocates in the legal profession to live close to the line, wherever the courts may draw it. Yet Rule 11 threatens them with severe sanctions if they miscalculate ever so slightly the location of that line. As a result many members of the bar are concerned that Rule 11 will discourage attorneys from pursuing novel yet meritorious legal theories. *See, e.g.,* Snyder, *The Chill of Rule 11,* 11 Litigation 16 (Winter 1985). The necessity of avoiding such an effect has also been widely recognized. As the Court of Appeals so eloquently put the matter:

> [W]e do not intend to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law. Vital changes have been wrought by those members of the bar who have dared to challenge the received wisdom, and a rule that penalized such innovation would run counter to our notion of the common law itself.

*Eastway I* at 254. *See Taylor v. Prudential-Bache Securities,* 594 F.Supp. 226, 229 (N.D.N.Y.), *aff'd mem.,* 751 F.2d 371 (2d Cir.1984); *Advisory Committee Notes to Rule 11* ("The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."). Unless Rule 11 is applied in a way that minimizes the tension between creativity and sanctions, a chilling effect seems inevitable.

 In part, the solution seems to lie in frank recognition of the fact that rather than being adequately described by the frivolous-nonfrivolous dichotomy, cases really do lie along a continuum. Some are clearly frivolous, some clearly nonfrivolous, and some are difficult to call. Attorney fee awards of the full market value of services rendered should be reserved for extremely frivolous cases, while more moderate awards should be given for frivolous filings near the border. This approach harmonizes with the deterrent approach of the Rule. It penalizes more severely conduct that society seeks more strongly to deter. But it penalizes only lightly filings in that zone where the bar's imagination and creativity assert themselves most strongly,

thus helping to insulate attorneys from the chill of the Rule.

(vii) *The Importance of Not Discouraging Particular Types of Litigation.* By providing that when the court finds the pleading or other papers to be frivolous, it "shall" impose sanctions, Rule 11 takes the decision whether to impose sanctions out of the trial judge's hands. The premise underlying the Rule's mandatory sanction is that frivolous pleadings are worthless and are to be always condemned. But such an interpretation takes too narrow a view of the purposes of litigation.

Some litigations should be, if not encouraged, at least not discouraged. Of particular importance are cases brought against government officials and government agencies. Such suits are often the only effective channel for keeping within bounds official arrogance and lawlessness. At the very least, they publicize grievances and thus permit the ventilation of private outrage that the First Amendment's right to petition protects. They serve the public policy of avoiding violence by providing a peaceful forum. They may provide the basis for legislative and executive ameliorative action even when the courts lack power to act. *See, e.g.*, Mather, *The Mobilizing Potential of Class Actions*, 57 Ind.L.J. 451 (1982). Many civil rights cases fall into this category. So, too, do many prisoner habeas corpus cases. And even in what appear to be purely commercial actions, the threat of suit may deter official abuses such as favoritism.

Sometimes there are reasons to sue even when one cannot win. Bad court decisions must be challenged if they are to be overruled, but the early challenges are certainly hopeless. The first attorney to challenge *Plessy v. Ferguson* was certainly bringing a frivolous action, but his efforts and the efforts of others eventually led to *Brown v. Board of Education.* Similarly, the apparently useless challenges by attorneys of the still relatively recent Supreme Court decision in *Swain v. Alabama* have induced the Court quickly to reconsider and reject that ill-conceived ruling. *Batson v. Ken-*

*tucky,* — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

(c) Award of attorney's fees for time spent on the motion for fees.

In cases in which a prevailing plaintiff is awarded attorney's fees under section 1988, he is also entitled to an award of fees for time spent in connection with the fee application. *See Gagne v. Maher*, 594 F.2d 336 (2d Cir.1979). The reason, according to the courts, is that any other approach would dilute the incentive provided by the fee award. Allowing attorney's fees for time spent on the motion for fees prevents any dilution of the incentive to bring civil rights actions.

A defendant requesting Rule 11 sanctions for a frivolous pleading is in a position analogous to that of a plaintiff in a civil rights action. Rule 11 differs from section 1988 as applied to plaintiffs in that it is designed to deter rather than encourage litigation. Nonetheless, the Rule is intended to further a governmental interest, in this case deterring frivolous actions from reaching the courts. In requesting Rule 11 sanctions, the defendant is acting as a private attorney general, enforcing the federal policy of deterring frivolous suits. In order not to discourage parties from bringing warranted Rule 11 motions, the time spent on the motion for fees should be taken into account in calculating the lodestar figure. *See, e.g., Perez v. Velez*, 629 F.Supp. 734, 737–38 (S.D.N.Y.1985) (awarding attorney's fees for time spent on the motion for attorney's fees).

Only time *reasonably* expended on the motion for attorney's fees should be includible in the lodestar calculation. If, for example, the defendant requests attorney's fees of an excessive amount, the plaintiff should certainly be entitled to contest the request without having to pay for the additional expenses being caused by the defendant's unreasonableness. Should defendant's fee request be so unreasonable as to itself rise to the level of frivolousness, Rule 11 sanctions may be imposed against the defendant for making that mo-

tion. *Cf. Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940 n. 10, 76 L.Ed.2d 40 (1983).

(d) Award of attorney's fees for time spent on appeal.

Prevailing plaintiffs in section 1988 cases are routinely awarded attorney's fees for time spent on a successful appeal. This is the logically correct result because success is the criterion for an award of fees to a civil rights suit plaintiff, and plaintiff's efforts on appeal have, by hypothesis, been successful. *See Hastings v. Maine-Endwell Central School District,* 676 F.2d 893 (2d Cir.1982); *Cohen v. West Haven Board of Police Commissioners,* 638 F.2d 496 (2d Cir.1980).

 In the case of Rule 11, an award of attorney's fees for the costs of defending an appeal can be made only if the appeal was frivolous. Generally the appellate court is in the best position to pass on whether an appeal is frivolous, and the district court is without authority to award attorney's fees for an appeal in the absence of instructions from the appellate court to do so. *See Sierra Club v. United States Army Corps. of Engineers,* 776 F.2d 383, 392 (2d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986); *Hastings v. Maine-Endwell Central School District,* 676 F.2d 893, 897 (2d Cir.1982); *see also Roth v. Pritikin,* 787 F.2d 54 (2d Cir.1986); *In re Cosmopolitan Aviation Corp.,* 763 F.2d 507, 517 (2d Cir.1985); *but cf. Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1179 (D.C.Cir.1985) (attorney's fees incurred in successfully appealing district judge's refusal to award Rule 11 sanctions should be included in Rule 11 sanctions). In the absence of an explicit direction from the appellate court, trial courts should not grant attorney's fees under Rule 11 for legal fees incurred on appeal.

D. *Awards of Attorney's Fees to Prevailing Defendants Under Section 1988.*

42 U.S.C. § 1988 provides that "[i]n any action or proceeding to enforce a provision of [certain civil rights statutes] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." The circumstances under which prevailing defendants are to be awarded fees under section 1988 were described by the Supreme Court in *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), which borrowed its standard from *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), a case concerned with the award of attorney's fees to prevailing defendants under section 706(k) of the Civil Rights Act of 1964. *Christiansburg* announced a standard essentially identical to the Second Circuit's purely objective interpretation of Rule 11. The Court wrote: "In sum, a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. at 700. The only important distinction between the two provisions is that sanctions under section 1988 may be assessed only against the opposing party, not its counsel.

Unlike Rule 11, which has a long, carefully drafted text and comes accompanied by even longer Committee Notes, the text of section 1988 is bare and brief. Furthermore, since *Hughes* and *Christiansburg* are quite recent cases, the caselaw applying the *Hughes* standard is still sparse. All in all, therefore, the law of attorney fee awards to prevailing defendants under section 1988 is poorly developed. But since sections 1988 and 706(k) and Rule 11 all have the same purpose and are applying the same standard, it is appropriate to borrow the caselaw of each to help develop the caselaw of the others. As already noted, treating awards under all the deterrence-oriented provisions similarly furthers both policy and ease of administration.

### III. LAW APPLIED TO THE FACTS

Rule 11 provides that, once a finding of frivolousness is made, the court "shall" impose sanctions which "may" include attorney's fees. And, as the Court of Appeals recognized in *Eastway I,* "the district

courts retain broad discretion in fashioning sanctions." *Eastway I*, 762 F.2d at 254 n. 7. Yet in its remand order the Court of Appeals intervened in the fashioning of sanctions by ordering the trial court to impose a sanction under Rule 11 that included a "reasonable attorney's fee." The opinion of the Court of Appeals cannot be read to take away in its text discretion that it had just recognized in its footnotes and that is granted by the Rule. Presumably, the Court of Appeals decided, *sub silentio*, that it would be an abuse of discretion in this particular case for the district court not to impose as the sanction an award of attorney's fees. *Cf. Albright v. Upjohn Company*, 788 F.2d 1217, 1222 (6th Cir. 1986) (reversing trial court's refusal to impose sanctions, but leaving decision on the nature of the sanctions to trial court on remand).

The Court of Appeals found plaintiffs' complaint legally, rather than factually, frivolous. Under *Eastway I*'s purely objective standard holding attorneys strictly liable for unreasonably filing frivolous papers, there was, the appellate court implicitly found, no need for a hearing to determine whether the Rule had been violated. Although the plaintiff was still entitled to an evidentiary hearing to provide proof of any factual circumstances supporting mitigation of the amount of attorney's fees, the plaintiff did not request a hearing and none was therefore held. The court did hear oral argument on the legal standards involved, and the legal issues were briefed.

### A. *Number of Compensable Hours and Allowable Maximum Hourly Rate*

The City requests an award of $58,550, which represents 395¾ hours of work for three different attorneys, John P. Woods, William L. Barish, and Fred Kolikoff. Mr. Barish worked on the antitrust and due process issues at the district court level, Mr. Woods on the attorney's fees issue at the district court level, and Mr. Kolikoff on the appeal to the Second Circuit. The City requests that fees be calculated using billing rates of $125 and $150 per hour. The

hours for which compensation is requested include time spent on the motion for attorney's fees, as well as time spent on the appeal.

#### (1) Time Spent on the Motion for Fees.

As indicated earlier, time spent on a motion for attorney's fees should be included in the lodestar figure. The number of hours requested in this case—184—seems high, but is not excessive in view of the difficulty of the issues involved and the court's request on two occasions for supplemental briefs on various questions.

#### (2) Time Spent on the Appeal.

█ As was indicated above, a trial court should not compensate in its award of attorney's fees time spent defending an appeal, absent an explicit finding by the Court of Appeals that the appeal was frivolous and an order directing the district court to award such fees. The Court of Appeals in *Eastway I* did not explicitly declare Eastway's position on appeal to be frivolous, and did not in its remand order instruct this court to award attorney's fees for the time spent by the City on the appeal. Accordingly, the City's request for attorney's fees for 43 hours spent by Mr. Kolikoff on the appeal must be denied.

#### (3) Maximum Allowable Fee.

█ The City requests compensation for 168¾ hours of Mr. Barish's time and for 184 hours of Mr. Woods' time, at an hourly rate of $150 per hour, for a total of $52,912.50. The number of hours requested is well-documented by affidavits, and justified by the difficulty of the issues involved in the case. The hourly rate of $150 is reasonable for Assistant Corporation Counsel who, at the time the case was before this court, had been in practice for 8 and 9 years, respectively. *See, e.g., Perez v. Velez*, 629 F.Supp. 734, 738 (S.D.N.Y. 1985) (allowing rate of $140 per hour for an Assistant Corporation Counsel with seven years' experience). Mr. Barish's and Mr. Woods' work, while of consistently high quality, did not justify an upward adjustment through use of a multiplier. The

maximum allowable fee in this case is therefore $52,912.50.

### B. *Mitigating Factors*
#### (1) Subjective Factors.

There is no evidence or reason to believe that plaintiffs or their attorneys did not bring this action in good faith for the purpose of obtaining the relief they sought. Plaintiffs had suffered serious financial reverses as a result of the defendants' actions. The suit itself was undoubtedly expensive. Plaintiffs' extensive papers reflected a great deal of research into the law and the facts and were well written, undoubtedly at high hourly rates. There was no desire to punish defendants or to harass them. The relevant subjective factors therefore point towards imposition of mild sanctions.

#### (2) Frivolousness of the Complaint.

The severity of the sanction to be imposed depends in part on the degree of frivolousness of the underlying claim. While the law of the case is that Eastway's claims were frivolous, investigation of the underlying substantive law reveals considerable support for Eastway's position.

#### (a) The antitrust claim.

■ The Court of Appeals' analysis of Eastway's antitrust claim was very brief; it did "not tarry over Eastway's appeal," *Eastway I* at 249, no doubt because the appellate court thought the frivolousness of the claim obvious. Nonetheless, it is possible to discern three separate points in the Second Circuit's discussion of the antitrust claim. First, the court seems to suggest that Eastway did not have antitrust standing, because the injury alleged was not "of the type that the antitrust laws are designed to prevent," *Eastway I* at 250. Second, the court found that Eastway's complaint did not allege a group boycott of a sort that would constitute a *per se* violation of the antitrust laws, *Eastway I* at 251 n. 5. Finally, the court found that Eastway could not prevail by proving the existence of a group boycott that violated the rule of reason, because 1) even if there had been a conspiracy between the City and the CPC, "such action could not possibly have injured competition. Indeed, Eastway does not even allege anti-competitive effect," *Eastway I* at 251; and 2) "neither the City nor CPC stood to gain from inhibition of competition among general contractors," *id.*

On the antitrust standing issue, the Court of Appeals appears, by citing and quoting Supreme Court decisions on antitrust standing, to be suggesting that Eastway lacks such standing. But *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), one of the opinions quoted by *Eastway I*, lends some support to plaintiffs' assertion of standing. The Court in *Associated* noted that "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages," 459 U.S. at 535–36, 103 S.Ct. at 907–08. The Court further explained that one factor to consider in determining whether the plaintiff has standing "is the directness or indirectness of the asserted injury," 459 U.S. at 540, 103 S.Ct. at 909. Since Eastway would have been a direct victim of the alleged conspiracy between the City and the consortium of many banks constituting the CPC, the quoted language arguably could be read to support its claim to standing.

In addition, the very complexity of the law on antitrust standing makes it difficult to say with assurance that any plaintiff's claim to have standing is obviously frivolous. One district court complained: "We must confess at the outset that we find antitrust standing cases more than a little confusing and certainly beyond our powers of reconciliation." *Wilson v. Ringsby Truck Lines*, 320 F.Supp. 699, 701 (D.Colo. 1970). *See also, e.g.*, Lobenfeld, *Antitrust Standing [in the Second Circuit]—A Somewhat Elusive Target*, 51 Brooklyn L.Rev. 525 (1985). Under the circumstanc-

es, the court finds that Eastway's claim that it had standing to bring an antitrust claim was not obviously frivolous.

Regarding the question whether Eastway's complaint had made out a *per se* violation of the antitrust laws, the Court of Appeals listed the cases relied upon by the plaintiffs and then commented in a footnote: "In those and other *per se* unlawful group boycott cases, the excluded plaintiff was in competition with some or all of the defendants. The same certainly cannot be said here; neither the City nor CPC competes in any way with any [plaintiff]." *Eastway I* at 251 n. 5. The Second Circuit's characterization of the three cases it listed by name, *Silver v. The New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and *Klor's Inc. v. Broadway— Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), is accurate, and the factual distinction between those cases and the instant one is quite real. It is not obvious, however, that the distinction should be dispositive. While the three Supreme Court cases listed did indeed involve situations in which the plaintiff was in competition with at least one of the alleged conspirators, in none of those cases was that fact stated to be a basis for the decision. Put another way, while the competition in those cases between the plaintiff and at least one defendant was a fact, it was not necessarily a material fact.

Legal scholars have long been troubled by the question of when a group boycott constitutes a *per se* violation of the antitrust laws as opposed to simply being subject to the "rule of reason." *See* Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination*, 79 Colum.L.Rev. 685 (1979). The Court of Appeals' analysis distinguishing between *per se* and non-*per se* group boycotts on the basis of the existence or nonexistence of competition between the plaintiff and the defendants represents a logical attempt to devise simple rules to determine whether claims state a *per se* cause of action. But it does not represent any fully settled law.

Several circuits have attempted to devise tests for determining the extent of the *per se* rule. As one commentator has noted, though, "[while] several lower courts have held that the per se rule applies only to *certain* group boycotts, ... Supreme Court decisions do not contain any such limitations." Bauer, *supra*, 79 Colum.L.Rev. at 694 (emphasis in original). The Supreme Court has itself noted the attempts by various courts and commentators to provide a workable definition of a group boycott that constitutes a *per se* violation, and concluded: "We express no opinion, however, as to the merit of any of these definitions." *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 542 n. 14, 98 S.Ct. 2923, 2930 n. 14, 57 L.Ed.2d 932 (1978). For the reasons stated, it is not completely clear that plaintiff's being a competitor of at least one of the parties to a group boycott is a *sine qua non* of a *per se* violation.

One Supreme Court decision provides at least some support for the opposite proposition, namely, that a group boycott can constitute a *per se* violation even when the plaintiff competes with none of the defendants. In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), the plaintiff, a liquor wholesaler, alleged that the defendants, two liquor distillers, had conspired to fix maximum resale prices and had agreed not to sell liquor to wholesalers who sold liquor for prices above the maximum. The Court first held that the price-fixing agreement was a *per se* violation of the antitrust laws. *Id.* at 213, 71 S.Ct. at 260. The Court then went on to consider a defense urged upon the Court by the distillers, that they were compelled to fix maximum prices because the wholesalers were conspiring to fix minimum prices. The Court rejected this argument, stating: "Seagram and Calvert acting individually perhaps might have refused to deal with petitioner or with any or all of the Indiana wholesalers. But the Sherman Act makes it an offense for respondents to agree among themselves to stop selling to partic-

ular customers." *Id.* at 214, 71 S.Ct. at 261. The Supreme Court here appears to be viewing the case as a group boycott case, and arguably seems to be saying, albeit somewhat cryptically, that a group boycott can constitute a *per se* violation of the antitrust laws even when the plaintiff is *not* a competitor of any of the defendants.

Although it is unclear whether the *Kiefer-Stewart* Court really intended an alternative holding based on a group boycott theory, the case has subsequently been cited as a group boycott case. The Supreme Court has itself cited *Kiefer-Stewart* as a group boycott case in several later group boycott decisions, including *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 212 n. 5, 79 S.Ct. 705, 709 n. 5, one of the classic group boycott cases cited in *Eastway I.* Finally, the Supreme Court has recently commented, without apparent disapproval, on its tendency to treat *Kiefer-Stewart* as a group boycott case. *See St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 544 n. 15, 98 S.Ct. 2923, 2931 n. 15, 57 L.Ed.2d 932 (1978).

Whether or not a concerted refusal to deal is an illegal *per se* group boycott is, in sum, often difficult to say. As one court recently put it, "A concerted refusal to deal is generally subject to a rule of *per se* illegality.... However, a confusing array of exceptions and qualifications to this rule have developed, and case law in this area is unsettled." *Cha-Car, Inc. v. Calder Race Course, Inc.,* 752 F.2d 609, 613 (11th Cir. 1985).

Even if the alleged conspiracy did not constitute an illegal boycott *per se,* it might still have been found illegal under the rule of reason. The Second Circuit found to be frivolous even Eastway's claim that the boycott was illegal under the rule of reason, because the "conspiracy could not possibly have injured competition. Indeed, Eastway does not even allege anti-competitive effect." *Eastway I* at 251. The Second Circuit's statement that the conspiracy *could not* have affected competition might be subject to factual dispute; nothing in

the record indicates that anticompetitive effect was inconceivable. Certainly, the defendants' actions decreased the number of persons who could bid on rehabilitation projects. Furthermore, that Eastway's complaint did not allege anti-competitive effect is immaterial. All a pleading need do, even in antitrust cases, is give notice of the nature of the claim to the opposing side. *See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 553–54 (2d Cir.1977) ("Even though appellants' claims were alleged with what would ordinarily be considered sufficient specificity, appellees contend ... that antitrust claims, because of their complexity, must be pleaded with greater specificity than other claims. It has been clear in this circuit since *Nagler v. Admiral Corp.,* 248 F.2d 319 (2d Cir. 1957) (Clark, C.J.), however, that a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules."); *compare Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) (where no facts alleged supporting an antitrust conspiracy, trial judge may, in his discretion, dismiss the claim), *with* Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure,* 86 Colum.L.Rev. 433, 435 (criticizing the holding in *Heart Disease* as being "worlds away" from Supreme Court precedent).

Finally, although Eastway did not have to allege anticompetitive effect, it in fact did so, although not in its complaint. Paragraph six of Plaintiffs' Statement Pursuant to Local Rule 3(g) claims "[t]hat the defendants' endeavors do have a substantial effect upon competitive conditions within the construction industry in relation to rehabilitation in the metropolitan New York area."

The Court of Appeals also found the rule of reason claim to be frivolous for a second reason, that "neither the City nor CPC stood to gain from inhibition of competition among general contractors." *Eastway I* at

251. The Court of Appeals' position appears to be that unless the conspirators intended to improve their position at the expense of the victim of the conspiracy, the victim cannot prevail. But as other courts dealing with similar situations have noted, whether the conspirators intended to improve their positions at the victim's expense is only one of many factors to be considered in a rule of reason analysis. As one court stated:

> The motive which underlies a challenged restraint is but one element in the examination for reasonableness.... Additionally, we should consider the relative positive and negative effects, the power of the parties in the markets they serve, and whether other less restrictive means could be employed to achieve the same desired ends.

*Hennessey v. National Collegiate Athletic Association*, 564 F.2d 1136, 1153 (5th Cir. 1977) (citation omitted); *see also Bridge Corporation of America v. American Contract Bridge League, Inc.*, 428 F.2d 1365, 1370 (9th Cir.1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971). The City and CPC dominate the relevant rehabilitation market, the boycott had a devastating effect on Eastway, and less restrictive alternatives may have been feasible. These factors arguably support Eastway's position.

For all of the above reasons, even though we are bound by the Court of Appeals' characterization of frivolousness, we cannot say that Eastway's antitrust claim was more than marginally frivolous. Many competent attorneys might have believed the claim viable.

(b) The due process claim.

██ The Court of Appeals found Eastway's due process claim frivolous for two reasons, *Eastway I* at 249–250. First, the court found that Eastway had not made out a claim for deprivation of "property" without due process of law because Eastway's interest in bidding on contracts did not rise to the level of a constitutionally protected, state-created property interest. Second, the court found that even if East-

way had a property right, the state court Article 78 proceeding had provided Eastway with sufficient process to protect Eastway's rights.

The Second Circuit emphasized that because Eastway had no entitlement to receive future contracts with the City, it possessed no protectible property interest. But the fourteenth amendment protects liberty interests as well as property interests, and several cases have held that government contractors may have a liberty interest in being allowed to bid for new contracts. As one court put it:

> One who has been dealing with the government on an ongoing basis may not be blacklisted, whether by suspension or debarment, without being afforded procedural safeguards including notice of the charges, an opportunity to rebut those charges, and under most circumstances, a hearing.... While the deprivation of the right to bid on government contracts is not a property interest ... the bidder's liberty interest is affected when that denial is based on charges of fraud and dishonesty.

*Transco Security Inc. of Ohio v. Freeman*, 639 F.2d 318, 321 (6th Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981). *Accord, Conset Corp. v. Community Services Administration*, 655 F.2d 1291 (D.C.Cir.1981); *Old Dominion Dairy Products v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir.1980).

In addition, a recent Third Circuit case has held that government contractors do have a property right to bid on state contracts. *Berlanti v. Bodman*, 780 F.2d 296 (3d Cir.1985), involved a fact pattern remarkably similar to the one in *Eastway*. The plaintiff, Samuel Berlanti, was president of a contracting company named Suffolk County Contractors, Inc. ("Suffolk"). Suffolk was found to have violated New Jersey's Prevailing Wage Act on several state contracts. As a response to Suffolk's violation of law, the New Jersey Department of Labor debarred both Suffolk and Berlanti from bidding on any public contracts for three years. Berlanti brought

suit in federal court, claiming that the statute did not give the Commissioner of Labor statutory authorization to pierce the corporate veil and debar Berlanti as an individual, and that his debarment violated his due process rights. The district court dismissed his claim, but the Third Circuit reversed. After analyzing New Jersey law dealing with the entitlements of government contractors, the court concluded "that Berlanti had a property interest in not being arbitrarily debarred." *Id.* at 300. Because there is caselaw supporting the proposition that government contractors have a liberty or property interest in the right to bid, we cannot say that Eastway's assertion of constitutionally protected interests was more than marginally frivolous.

By stating that Eastway was in any event afforded sufficient due process by the Article 78 proceeding, the Second Circuit was in effect ruling that Eastway was not entitled to a predeprivation hearing. Entitlement to a predeprivation hearing is controlled by the balancing test of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The general difficulty of predicting the outcome of balancing tests would alone be sufficient to establish that Eastway's claim of entitlement to a predeprivation hearing was not extremely frivolous. In addition, there is the fact that other courts have found postdeprivation remedies inadequate in similar situations involving government contractors. In *Berlanti,* for example, the plaintiff had recourse to a state court action similar to an Article 78 proceeding, but the Third Circuit found this not to be dispositive. Rather than relying on the availability of a postdeprivation hearing as grounds for affirming the district court's dismissal of the action, the court remanded to the trial court, and ordered it "to consider whether 'this case falls within the extremely narrow lines reserved for the limited situations where the hearing may properly be postponed until after the deprivation has been effected,'" *Berlanti* at 301–02, *quoting Stana v. School District of the City of Pittsburgh,* 775 F.2d 122, 127 (3rd Cir.1985). *See also Old Dominion Dairy Products v. Secretary of Defense,* 631 F.2d

953, 967 (D.C.Cir.1980). ("[W]e hold that subsequent procedures did not satisfy the requirements of due process. . . .").

One final point in the Court of Appeals' *Eastway I* opinion deserves mention. In explaining its decision to award attorney's fees under section 1988, the court relied upon Eastway's prior unsuccessful state litigation, commenting:

> [W]e find it particularly noteworthy that Eastway had already challenged the City's policy in the state courts, and had been unsuccessful. These proceedings should at least have put it on notice of the possiblity that its adversary might be awarded counsel fees. *See Carrion v. Yeshiva University,* 535 F.2d 722, 728 (2d Cir.1976) (upholding an award of attorney's fees to successful defendant in Title VII action, where plaintiff had brought similar claims in a state proceeding and had lost).

*Eastway I* at 252. The question of what Eastway should have learned from its setback in the state court is an interesting one, reminiscent of the dispute about whether the glass is half full or half empty. Eastway's loss on its state law claim in the Appellate Division certainly put it on notice that its federal claim might fail as well. But its successful motion for summary judgment in the New York Supreme Court also gave Eastway reason to believe that its case had some merit. This, in turn, gave Eastway some grounds to believe that it would not be sanctioned, especially considering *Eastway I*'s definition of "frivolousness" as a case where "it is patently clear that a claim has absolutely no chance of success," *Eastway I* at 254. The *Carrion* case relied upon in *Eastway I* is arguably distinguishable, because plaintiff's state court action in *Carrion* had failed at *both* trial and appellate levels.

For all the above reasons, even though it is bound by the Second Circuit's characterization of frivolousness, this court cannot say that Eastway's due process claim was extremely frivolous. Many competent lawyers might have believed this claim to be viable.

### (3) Need of Lawyer and Client for Punishment.

Plaintiffs' lead counsel, James LaRossa, is a leading member of the bar. He has been practicing law for nearly 30 years, including 3 years spent as an Assistant United States Attorney in this district. He is admitted to practice before the United States Supreme Court and several Circuit Courts of Appeal. He has lectured numerous times at PLI seminars, state trial lawyer association conferences and at Harvard Law School. He has published articles of interest to the bar in the areas of evidence and white collar crime and has received the American Academy of Achievement Award as Outstanding Lawyer of the Year and the B'nai Brith National Medal of Honor. He has tried numerous difficult cases in this court and is well respected by the Bench of this district. Such an attorney needs no punishment to induce him to act ethically. Nor is there any showing that plaintiffs have a history of abusing the courts that would support a severe sanction.

### (4) Ability to Pay and Need for Compensation.

Neither plaintiffs not plaintiffs' counsel have requested a hearing to present evidence of financial distress. Accordingly, their fiscal status will not be taken into account at this time. Should they wish to do so at a later time, they may make a motion to reconsider the sanction because of inability to pay. *See Oliveri v. Thompson*, CV–83–3572 (E.D.N.Y. Nov. 13, 1985) (conditional award of attorney's fees of $51,000, pending a later hearing to determine counsel's ability to pay). There appears to be no reason to believe that this suit has unduly burdened the City or its huge Corporation Counsel's office.

### (5) Chilling This Type of Litigation.

Suits of this kind should not be kept out of court by threats of sanctions except in the clearest case of frivolousness. What lies below the surface in real estate litigation of this type against the City is the suspicion of widespread cronyism, favoritism and corruption. Contributions of real estate people to political campaigns are of major importance in New York City and State. Political connections are worth many millions of dollars in city contracts and other favors. There is no continuing method by which the criminal law, political processes or even the press can police this dangerously explosive combination of politics, money and power. *See, e.g., Key Officials Call Scandal Undetectable*, N.Y. Times, May 12, 1986, at B1, col. 1; *Bronx Development Official Testifies Before Grand Jury, id.*, May 10, 1986, at 31, col. 5; *U.S. Indictment Says a City Aide Got Real-Estate Holding as Bribe, id.*, May 8, 1986, at A1, col. 2; *City Ends Contract for Queens Tower, id.*, May 14, 1986, at B2, col. 3; *Eastway I* at 246.

This litigation, had it been permitted to go forward, might have revealed unseemly aspects of the City's real estate transactions, an area long shadowed by charges of favoritism and politicization. Lurking behind the allegations in this suit were implications of serious misconduct by the City in granting favored—and unfavored—treatment. Under such conditions it becomes dangerous to throttle any avenue to the courts for vindication of rights of private real estate developers.

### C. *Allocation of Award of Attorney's Fees*

The Second Circuit's mandate to this court on remand was to award attorney's fees for the due process claim against the plaintiffs alone under section 1988, and to award attorney's fees for the antitrust claim against the plaintiffs or their counsel or both under Rule 11. *Eastway I* at 254; *cf. Donaldson v. Clark*, 786 F.2d 1570 (11th Cir.1986) (awarding attorney's fees to prevailing defendants in a section 1983 action under Rule 11 rather than under section 1988).

If this court were to now impose any attorney's fees against plaintiffs' counsel under Rule 11, it would be necessary to allocate the time spent by the City's counsel between the due process claim and the antitrust claim to ensure that client and counsel are each sanctioned the proper

amount. If, on the other hand, the court does not impose any sanctions on plaintiffs' counsel, allocation between causes of action will be unnecessary because the entire sanction can simply be imposed on the client. As a cursory examination of Mr. Barish's and Mr. Woods' time records indicates, and as the City conceded at oral argument, it would be difficult if not impossible to allocate their hours between the two causes of action. The court therefore concludes that, in the interests of efficiency, fairness and policy, the Rule 11 sanctions, as well as section 1988 sanctions, should be imposed against the plaintiffs alone.

## IV. CONCLUSION

 In accord with the mandate of the Court of Appeals, attorney's fees must be awarded in this case. Heavy sanctions would be unfair because *Eastway I* is a case of first impression; there was no reason for plaintiffs or their counsel to have predicted the objective standard Rule 11 ruling of the Court of Appeals. In addition, because the case was brought in good faith, because of the otherwise exemplary conduct of plaintiffs' counsel, because the pleading was only marginally frivolous, and for other reasons set forth in this opinion, attorney's fees in the amount of $1,000, jointly and severally, against plaintiffs Eastway Construction Corporation, Jaffee, Kanarek, and Jacobs, are sufficiently punitive.

This award is considerable in light of the nominal $100 sanctions imposed by other courts under similar circumstances. Courts must take care not to use their almost unlimited Rule 11 powers to punish in a vindictive and excessively harsh manner.

So ordered.